TODD KIM, Assistant Attorney General
S. JAY GOVINDAN, Section Chief
MEREDITH L. FLAX, Deputy Section Chief
DAVIS A. BACKER, Trial Attorney (CO Bar No. 53502)
LESLEY LAWRENCE-HAMMER, Senior Trial Attorney (DC Bar No.982196)
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace – Suite 370, Denver, CO 80202
Tel: (202) 514-5243
Fax: (202) 305-0275
Email: davis.backer@usdoj.gov

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:20-cv-00573-EGS |
| ) | |
| DAVID BERNHARDT, in his official capacity ) | |
| as Secretary of the United States Department of ) | |
| the Interior, et al., ) | |
| ) | |
| Defendants, ) | |

**<u>DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR
SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

**PAGE**

<u>INTRODUCTION</u> ......................................................................................................1

<u>STATUTORY AND REGULATORY BACKGROUND</u> ...........................................3

    I.   Endangered Species Act ...............................................................................3

      A.  Listing Process...........................................................................................3

      B.  Critical Habitat Designation Process ........................................................6

      C.  The National Listing Workplan ................................................................7

<u>FACTUAL BACKGROUND</u>.....................................................................................8

    I.   The Service has made positive 90-day findings for each of the species at issue in this action...........................................................................................8

    II.  The Service continues to make diligent progress towards completing listing determinations in accordance with its National Listing Workplan. ....................................9

<u>STANDARD OF REVIEW</u>......................................................................................10

<u>ARGUMENT</u>..........................................................................................................11

    I.   Plaintiff lacks standing to bring claims with respect to 18 species....................................11

      A.  Plaintiff lacks organizational standing to challenge any missed petition deadlines........13

      B.  Plaintiff lacks associational standing to challenge missed deadlines on petitions to list at least 14 different species. .....................................................17

    II.  For those species for which Plaintiff has demonstrated standing, the Court has broad equitable discretion with respect to injunctive relief......................................................23

      A.  Courts have broad discretion even where a statutory deadline is involved. .................23

      B.  The ESA does not constrain the Court's discretion. .................................25

    III.  The remedy proposed by the Service best preserves the benefits of its Workplan and best furthers the ESA's conservation goals............................................................26

      A.  The Service's Workplan advances the goals of the ESA. .............................................26

B.    Plaintiff's proposed remedy cannot be achieved without undermining the goals of the Service's Workplan and the ESA. ..............................................................28

C.    As articulated in *Train*, courts recognize that it may be infeasible for agencies to comply with statutory deadlines. ..............................................................30

D.    The Court has discretion to set a feasible remedy that preserves the Workplan's schedule and its ordering of priorities. ..........................................................32

IV.   The Service cannot disregard Congressionally imposed appropriations caps. .................34

A.    Congress places annual caps on the Service's ESA listing program. ...........................34

B.    The Service expends funds on the ESA listing program in accordance with Congress's direction. ...................................................................................36

C.    Plaintiff's attempt to use this Court's equitable powers to circumvent the listing program's spending cap should be rejected. ..................................................37

V.    The Court should defer to the Service's proposed compliance timeline, as outlined in the National Listing Workplan. ..............................................................38

VI.   Plaintiff's additional request for declaratory relief is inappropriate and should be denied. .........................................................................................40

CONCLUSION ..............................................................................................43

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Adams v. United States*,
  141 Fed. Cl. 428 (2019) ...............................................................................34

*Am. Bioscience v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ...................................................................11

*Am. Lung Ass'n*,
  884 F. Supp. ..................................................................................................24

*Andrus v. Sierra Club*,
  442 U.S. 347 (1979) .....................................................................................34

*Bennett v. Spear*,
  520 U.S. 154 (1997) .....................................................................................10

*Biodiversity Legal Found. v. Babbitt*,
  146 F.3d 1249 (10th Cir. 1998)....................................................................30

*Biodiversity Legal Found. v. Norton*,
  285 F.Supp.2d 1 (D.D.C. 2003) .................................................................9, 11

*Bloch v. Powell*,
  227 F. Supp. 2d 25 (D.D.C. 2002) ...............................................................10

*Cabinet Mountains Wilderness v. Peterson*,
  685 F.2d 678 (D.C. Cir. 1982) .......................................................................8

*Cal. Native Plan Soc'y v. Norton*, No. Civ. A. 03-1540 (JR),
  2005 WL 768444 (D.C. Cir. Mar. 24, 2005) ...............................................30

*CBD v. Norton*,
  Civil No. 01-2101-IEGLAB, 2003 WL 22225620 (S.D. Cal. Sept. 9, 2003)..........................26

*CBD v. U.S. DOI*,
  No. 22-CV-01716 (TSC), 2023 WL 7182041 (D.D.C. Nov. 1, 2023)..............................passim

*Center for Biological Diversity v. Haaland*,
  No. 20-CV-1227-JLA, 2021 WL 4169567 (Sept. 14, 2021 N.D. Ill.) .........................24, 28, 29

*Center for Biological Diversity v. U.S. Fish and Wildlife Service*,
  No. 19-CV-354-TUC-JAS, 2020 WL 13865447 (Nov. 24, 2020 D. Ariz.) ...........................24

*Chamber of Com. of U.S. v. EPA*,
  642 F.3d 192 (D.C. Cir. 2011) ...........................................................................................17

*Cincinnati Soap Co. v. United States*,
  301 U.S. 308 (1937) ...........................................................................................................34

*Colo. River Cutthroat Trout v. Kempthorne*,
  448 F. Supp. 2d 170 (D.D.C. 2006)....................................................................................25

*Conservation Force v. Jewell*,
  733 F.3d 1200 (D.C. Cir. 2013) ...........................................................................................9

*Conservation Force v. Salazar*,
  851 F.Supp.2d 39 (D.D.C. 2012) ..........................................................................................9

*Contoski v. Scarlett*,
  Civil No. 05-2528 (JRT/RLE), 2006 WL 2331180 (D. Minn. Aug. 10, 2006) .....................26

*Coos Cty. Bd. of Cnty. Comm'rs v. Kempthorne*,
  531 F.3d 792 (9th Cir. 2008)...............................................................................................30

*Cronin v. Browner*,
  90 F. Supp. 2d 364 (S.D.N.Y. 2000) ...................................................................................24

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) .....................................................................................................11, 37

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008) ...........................................................................................................19

*Defs of Wildlife v. Norton*,
  239 F. Supp. 2d 9 (D.D.C. 2002) ........................................................................................26

*Del Monte Fresh Produce Co. v. United States*,
  570 F.3d 316 (D.C. Cir. 2009) ..............................................................................................9

*District of Columbia v. Barrie*,
  741 F. Supp. 2d 250 (D.D.C. 2010)....................................................................................43

*Dolan v. United States*,
  130 S. Ct. 2533 (2010)...................................................................................................25, 26

*Env't Def. Ctr. v. Babbitt,*
    73 F.3d 867 (9th Cir. 1995)...................................................................................30

*Food & Water Watch, Inc. v. Vilsack,*
    808 F.3d 905 (D.C. Cir. 2015) ........................................................................ 12, 13

*Friends of Wild Swan v. FWS,*
    945 F. Supp. 1388 (D. Or. 1996).........................................................................30

*Fund for Animals v. Babbitt,*
    903 F. Supp. 96 (D.D.C. 1995) ...........................................................................10

*Gerber v. Norton,*
    294 F.3d 173 (D.C. Cir. 2002) ..............................................................................8

*Greater Yellowstone Coal. v. Servheen,*
    665 F.3d 1015 (9th Cir. 2011)..............................................................................10

*Hanes Corp. v. Millard,*
    531 F.2d 585 (D.C. Cir. 1976) ........................................................................40, 41

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) .............................................................................................13

*Hecht Co. v. Bowles,*
    321 U.S. 321 (1944) ........................................................................................23, 38

*In re Barr Labs.,*
    930 F.2d 72 (D.C. Cir. 1991) .....................................................................23, 32, 33

*In re Monroe Commc'ns,*
    840 F.2d 942 (D.C. Cir. 1988) .............................................................................32

*In re Sw. Rsch. & Info. Ctr.,*
    No. 95-1285, 1995 WL 495948 (D.C. Cir. Aug. 14, 1995)....................................23

*In re United Mine Workers of Am. Int'l Union,*
    190 F.3d 545 (D.C. Cir. 1999).............................................................................33

*INS v. Pangilinan,*
    486 U.S. 875 (1988) .............................................................................................38

*Kleppe v. Sierra Club,*
    427 U.S. 390 (1976) .............................................................................................28

*La Botz v. Fed. Election Comm'n,*
 61 F. Supp. 3d 21 (D.D.C. 2014) .................................................................. 19, 22

*Las Vegas v. Lujan,*
 891 F.2d 927 (D.C. Cir.1989) ............................................................................ 10

*Lincoln v. Vigil,*
 508 U.S. 182 (1993) ........................................................................................... 37

*Lujan v. Defs. of Wildlife,*
 504 U.S. 555 (1992) ...................................................................................... passim

*Lujan,*
 497 U.S. 871 (1990) ........................................................................................... 41

*Me. Ass'n of Handicapped Persons v. Dole,*
 623 F. Supp. 920 (D. Me. 1985) ......................................................................... 24

*Mylan Pharms. v. Shalala,*
 81 F. Supp. 2d 30 (D.D.C. 2000) ........................................................................ 23

*Nat. Res. Def. Council v. Train,*
 ("Train"), 510 F.2d 692 (D.C. Cir. 1975) ..................................................... passim

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers,*
 170 F. Supp. 3d 6 (D.D.C. 2016) ................................................................... 12, 15

*Nevada v. Dep't of Energy,*
 400 F.3d 9 (D.C. Cir. 2005) ............................................................................... 37

*Norton v. S. Utah Wilderness,*
 *All.,* 542 U.S. 55 (2004) ............................................................................... 10, 41

*Occidental Eng'g Co. v. INS,*
 753 F.2d 766 (9th Cir. 1985) ............................................................................... 8

*Off. of Pers. Mgmt. v. Richmond,*
 496 U.S. 414 (1990) .............................................................................. 34, 37, 38

*Public Service Comm'n v. Wycoff Co.,*
 344 U.S. 237 (1952) ........................................................................................... 40

*Salazar v. Ramah Navajo Chapter,*
 567 U.S. 182 (2012) ........................................................................................... 35

*Sierra Club v. EPA,*
   292 F.3d 895 (D.C. Cir. 2002) ........................................................................ 18

*Sierra Club v. Thomas,*
   658 F. Supp. 165 (N.D. Cal. 1987) ................................................................. 23

*Sierra Club v. Thomas,*
   828 F.2d 783 (D.C. Cir. 1987) ........................................................................ 24

*Steffel v. Thompson,*
   415 U.S. 452 (1974) ........................................................................................ 40

*Summers v. Earth Island Inst.,*
   555 U.S. 488, (2009) ................................................................................. 12, 22

*Telecomms. Research Action Ctr. v. FCC,*
   750 F.2d 70 (D.C. Cir. 1984) .......................................................................... 32

*Tenn. Valley Auth. v. Hill,*
   ("TVA"), 437 U.S. 153 (1978) ................................................................... 26, 34

*The Wilderness Soc'y v. Norton,*
   434 F.3d 584 (D.C. Cir. 2006) ........................................................................ 42

*Toilet Goods Ass'n, Inc. v. Gardner,*
   387 U.S. 158 (1967) ........................................................................................ 41

*TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 ......................................................................................... 11, 15

*United States House of Representatives v. Burwell,*
   130 F. Supp. 3d 53 (D.D.C. 2015) .................................................................. 34

*United States v. Dickerson,*
   310 U.S. 554 (1940) ........................................................................................ 35

*United States v. Oakland Cannabis Buyers' Co-op.,*
   532 U.S. 483 (2001) ........................................................................................ 25

*United States v. Will,*
   449 U.S. 200 (1980) ........................................................................................ 35

*United Steelworkers of Am. v. Rubber Mfrs. Ass'n,*
   783 F.2d 1117 (D.C. Cir. 1986) ...................................................................... 24

*W. Coal Traffic League v. Surface Transp. Bd.*,
  216 F.3d 1168 (D.C. Cir. 2000) ..........................................................................23

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ........................................................................................23

*WildEarth Guardians v. Haaland*,
  No. 20-CV-1035-CKK, 2021 WL 4502054 (Sept. 30, 2021 D.D.C.)................................25, 28

## STATUTES

5 U.S.C. § 553 .......................................................................................................5
5 U.S.C. § 706 ...................................................................................................8, 10
5 U.S.C. § 706(1) .................................................................................................10
16 U.S.C. § 1531(b) .......................................................................................3, 4, 26
16 U.S.C. § 1532(5)(A) ...........................................................................................6
16 U.S.C. § 1532(6) ...............................................................................................3
16 U.S.C. § 1532(16) .............................................................................................3
16 U.S.C. § 1532(20) .............................................................................................3
16 U.S.C. § 1533(a)(1) ..........................................................................................3, 4
16 U.S.C. § 1533(a)(3)(A)(i) ...................................................................................3, 7
16 U.S.C. § 1533(b)(1)(A) ......................................................................................4
16 U.S.C. § 1533(b)(2) ...........................................................................................6
16 U.S.C. § 1533(b)(3)(A) .......................................................................................4
16 U.S.C. § 1533(b)(3)(B) .......................................................................................4
16 U.S.C. § 1533(b)(3)(B)(ii) ...................................................................................4
16 U.S.C. § 1533(b)(3)(B)(iii)(I) ..............................................................................5
16 U.S.C. § 1533(b)(3)(B)(iii)(II) .............................................................................5
16 U.S.C. § 1533(b)(3)(C)(i) ....................................................................................6
16 U.S.C. § 1533(b)(3)(C)(iii) ..................................................................................6
16 U.S.C. § 1533(b)(4) ...........................................................................................5
16 U.S.C. § 1533(b)(5)(A)(i) ....................................................................................5
16 U.S.C. § 1533(b)(6)(A) .......................................................................................5
16 U.S.C. § 1533(b)(6)(C)(ii) ...................................................................................7
16 U.S.C. § 1533(b)(7) ...........................................................................................6
16 U.S.C. § 1533(b)(7)(A) .......................................................................................6
16 U.S.C. § 1533(b)(7)(B) .......................................................................................6
16 U.S.C. § 1533(d) ...........................................................................................4, 26
16 U.S.C. § 1533(h)(3) .....................................................................................5, 6, 26
16 U.S.C. § 1540(g) ..............................................................................................10
16 U.S.C. § 1540(g)(1)(C) ..................................................................................10, 25
16 U.S.C. § 1540(g)(5) ..........................................................................................26
31 U.S.C. § 1341(a)(1)(A) ......................................................................................31
33 U.S.C. § 1533(a)(3)(A) ......................................................................................31

**RULES**

Federal Rule of Civil Procedure 8 ................................................................42

**FEDERAL REGULATIONS**

50 C.F.R. § 424.12(a)(1) ...........................................................................7
50 C.F.R. § 424.12(a)(2) ...........................................................................7
50 C.F.R. § 402.12(d) .................................................................................5
50 C.F.R. § 424.16(c)(2) .............................................................................5
50 C.F.R. § 424.20 ......................................................................................6
8 Fed. Reg. 41,560 (June 27, 2023 ..........................................................6
48 Fed. Reg. 43,098 (Sept. 21, 1983) .......................................................5
49 Fed. Reg. 38,900, 38,903 (Oct. 1, 1984). ............................................7
75 Fed. Reg. 69,222, 69,224 (Nov. 10, 2010) ..........................................27
81 Fed. Reg. 49,248 (July 27, 2016) .........................................................7
84 Fed. Reg. 45,020, 45,040-43 (Aug. 27, 2019) .....................................7
88 Fed. Reg. 83,368 ...............................................................................1, 14
88 Fed. Reg. 84,252 ...............................................................................1, 14

**Other Authorities**

1982 U.S.C.C.A.N. 2860..................................................................10, 31, 34
1997 U.S.C.C.A.N. 2186..............................................................................40
H.R. Conf. Rep. No. 97-835 ........................................................................10

Defendants, Debra Haaland, in her official capacity as Secretary of the United States Department of the Interior, and Martha Williams, in her official capacity as Director of the United States Fish and Wildlife Service ("FWS" or "Service"), respectfully submit this Memorandum in support of their Cross-Motion for Summary Judgment and in response to Plaintiff's Motion for Summary Judgment (ECF No. 60).

## INTRODUCTION

This case is not about liability. Plaintiff alleges that the Service has failed to comply with its mandatory duty to publish 12-month findings in response to petitions to list what are now 80 species as threatened or endangered under the Endangered Species Act ("ESA").[1] The Service, for its part, does not dispute that it has missed these deadlines—a consequence of several factors. At bottom, however, the Service's inability to meet these statutory deadlines reflects the practical realities and limitations of an agency with immense responsibilities and finite resources grappling with an ever-increasing workload of statutorily required actions. The present predicament thus is not the result of an agency that has willfully ignored its statutory obligations as Plaintiff suggests. Rather, it reflects the Service's concerted efforts to strike a reasonable balance between the competing needs of numerous species (including those at issue here) and its limited funding and staffing resources. This is an exceedingly difficult task, and this case ultimately requires the Court to determine whether the careful balance that the agency has struck reasonably addresses these species' needs consistent with its statutory duties, while also accounting for these practical

---

[1] Plaintiff's complaint originally challenged missed deadlines for 241 different species in three separate claims, but as of the date of this filing, following earlier efforts to litigate and settle this matter, and the Service's progress in publishing 12-month findings outside of litigation, only 80 species remain at issue, and all fall under Plaintiff's first claim. *See* ECF Nos. 1, 28, 37, 38, 45, 46, 51, 54. Plaintiff's memorandum in support of its motion for summary judgment ("Pl.'s Mem.") states that there are 89 species that remain subject to suit. ECF No. 60 at 1-2 n.1. However, since Plaintiff filed its motion for summary judgment on November 3, 2023, the Service has completed 12-month findings for nine additional species: Florida pinesnake, Mimic cavesnail, northern cavefish, and Texas troglobitic water slater (88 Fed. Reg. 83,368) published November 29; and Western spadefoot toad (88 Fed. Reg. 84,252) published December 5. Findings for an additional four species were sent to the Federal Register on December 15, 2023: Hubricht's cave beetle, silken cave beetle, Pinaleño talussnail, and San Xavier talussnail.

constraints.

Although the Service does not contest liability under the ESA, as a threshold matter it does challenge Plaintiff's standing to bring challenges for certain species and also opposes the remedy requested by Plaintiff in its motion for summary judgment, ECF No. 60. The most expeditious and practical remedy would be one that allows sufficient time for the Service to make scientifically defensible 12-month findings for these remaining species by reasonable and feasible dates set by the Court. The Court has broad equitable discretion in fashioning such an injunctive remedy, as three separate district courts—including another Judge in this same court—have already held. With this discretion, given the present and anticipated funding levels of the ESA listing program, the Service's current and extensive National Listing Workplan, and the Service's overall ESA workload, the Court should order the Service to submit findings for the species for which the Court finds Plaintiff has standing consistent with the dates set forth in the Service's National Listing Workplan. *See* Exhibit A, National Listing Workplan (highlighting species remaining subject to suit).

Plaintiff's requested injunctive remedy—requiring the Service to issue 80 separate 12-month findings within one year of a court order—is neither workable nor responsible. Even if the Service could complete such a task in twelve months—and it cannot—it would simultaneously (i) require delaying other listing obligations already in the queue that the Service has determined are of higher conservation priority; (ii) undermine the Service's National Listing Workplan and broader conservation purposes that ESA listing deadlines are meant to promote; and (iii) result in scientifically deficient 12-month findings that would find these same parties, or possibly different plaintiffs, before the Court, again, in short order, litigating the merits of those same findings. Only the remedy proposed by the Service offers sufficient latitude to accommodate these additional demands into an already taxing workload with the limited funding provided by Congress. It will maintain balance in the Service's ESA listing program and will allow the Service the time it needs to complete thorough and defensible findings based on the best scientific and commercial data available.

Moreover, there is no legal basis for Plaintiff's extraordinary request that the Court enter a broad declaratory judgment that the Service "has systemically failed to respond to" Plaintiff's listing petitions, and that "the Service has not demonstrated that its current system is designed to respond to petitions within statutory timelines." Pl.'s Mem. at 53. Such sweeping relief runs counter to the notion that courts may order *when* an agency must comply with its nondiscretionary duties, but not *how* the agency must comply with those duties. Furthermore, Plaintiff's anticipation that such relief "*may* have the salutary effect of spurring the agency to take action," *id.* (emphasis added), falls short of "substantially likely to redress the alleged injury" as required by Article III. Finally, it exceeds the scope of relief outlined in Plaintiff's complaint.

## STATUTORY AND REGULATORY BACKGROUND

### I.    Endangered Species Act

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).[2] As relevant here, ESA Section 4 directs the Secretaries of the Interior and Commerce to determine whether a particular species should be listed as "endangered" or "threatened," *id.* § 1533(a)(1), and to designate "critical habitat" for listed species, *id.* § 1533(a)(3)(A)(i).[3]

### A.    Listing Process

Section 4(a)(1) of the ESA requires the Secretary to determine whether a species may be listed as endangered or threatened based on one or more of five factors: (1) the present or

---

[2] The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range," *id.* § 1532(6), and a "threatened species" as one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," *id.* § 1532(20). In addition, the ESA defines the term "species" to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16).

[3] The Secretary of the Interior ("Secretary"), acting through FWS, is generally responsible for all terrestrial and freshwater species, including the 80 species at issue here.

threatened destruction, modification, or curtailment of its habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; or (5) other natural or manmade factors affecting its continued existence. *Id*. § 1533(a)(1). If a listing is finalized, the ESA provides various protections for the species. *See id*. §§ 1533(d), 1536, 1538.

Any "interested person" may petition FWS to list a species. *Id*. § 1533(b)(3)(A).[4] Upon receipt of a petition to list a species, the Secretary must, "[t]o the maximum extent practicable," complete a finding within 90 days ("90-day finding") to determine "whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id*. If the Secretary finds that the petition does not present substantial information indicating that listing may be warranted, the listing process for that petition ends. However, if the Secretary finds that the petition does present substantial information indicating that listing may be warranted, the Secretary, acting through FWS, must commence a status review, *id*., which requires the agency to evaluate the "best scientific and commercial data available" for the species and also "tak[e] into account those efforts, if any, being made by any State or foreign nation . . . to protect such species." *Id*. §1533(b)(1)(A).

Within 12 months after receiving a petition presenting substantial information indicating that listing may be warranted, FWS must issue one of the following determinations ("12-month finding"): (1) listing is not warranted; (2) listing is warranted; or (3) listing is warranted, but listing the species is precluded by pending proposals for other species. *Id*. § 1533(b)(3)(B). If FWS finds that listing is "not warranted," the listing process for that petition ends. However, if FWS determines that listing is "warranted," it must promptly publish in the Federal Register "a general notice and the complete text of a proposed regulation to implement" the listing, *id*. §

---

[4] Petitions may also seek to delist a previously listed species or to reclassify the listing status of a species, *i.e.*, "uplisting" a species from threatened to endangered, or "downlisting" a species from endangered to threatened, although all petitions are subject to the same process. In addition to the citizen petition process, FWS may assess a species for listing on its own initiative pursuant to a separate process known as the "candidate assessment process."

1533(b)(3)(B)(ii), (b)(5)(A)(i) ("proposed rule"), and also provide for a public comment period of 60 days. 50 C.F.R. § 424.16(c)(2). Within 12 months following the issuance of a proposed rule, FWS must publish one of the following determinations: (1) a final rule implementing the listing determination; (2) notice that the agency is withdrawing the proposed rule; or (3) notice that the agency requires a six-month extension for purposes of soliciting and analyzing additional data if "there is substantial disagreement regarding the sufficiency or accuracy of the available data." 16 U.S.C. § 1533(b)(6)(A), (B)(i).[5]

With respect to the third type of 12-month finding—a "warranted-but-precluded" finding—FWS must determine that the listing of a species is warranted, but that "the immediate proposal and timely promulgation of a final regulation implementing [listing] . . . is precluded by pending proposals to determine whether any species is an endangered species or a threatened species." *Id*. § 1533(b)(3)(B)(iii)(I). In addition, the agency must determine that "expeditious progress is being made to add qualified species" to the list of threatened or endangered species, and to delist species that are no longer qualified. *Id*. § 1533(b)(3)(B)(iii)(II). Species whose listings have been found to be warranted but precluded are known as "candidate species."[6] For such species, FWS does not immediately begin the process of preparing proposed rules.[7] Instead, the agency is required to

---

[5] Any proposed or final rules are subject to notice-and-comment rulemaking. *See* 16 U.S.C. § 1533(b)(4); 5 U.S.C. § 553.

[6] Although ESA protections do not extend to candidate species, FWS provides federal agencies with its annual list of candidate species to encourage the development of conservation measures to protect these species. *See* 50 C.F.R. § 402.12(d).

[7] In considering the order for addressing candidate species, the agency applies its listing priority guidelines. *See* 48 Fed. Reg. 43,098 (Sept. 21, 1983) ("Guidelines"). These Guidelines provide for the ranking of candidate species according to (1) the magnitude of threats they face; (2) the immediacy of those threats; and (3) their taxonomic distinctiveness. *Id*.; *see also* H.R. Conf. Rep. No. 97-835, at *21 (1982), reprinted in 1982 U.S.C.C.A.N. 2860, 2862 (reflecting Congress's instruction that FWS "utilize a scientifically based priority system to list and delist species, subspecies and populations based on the degree of threat, and proceed in an efficient and timely manner"); 16 U.S.C. § 1533(h)(3). Based on the Guidelines, candidate species are ranked by listing priority numbers ("LPNs"), which range from 1 (highest priority) to 12 (lowest priority). 48 Fed. Reg. at 43,102-03.

monitor the status of candidate species and, if necessary, "make prompt use" of its emergency listing authority "to prevent a significant risk to the wellbeing of any such species." *Id*. §§ 1533(b)(3)(C)(iii), (b)(7).[8] Further, the publication of a warranted-but-precluded finding provides public notice that FWS is seeking information as to the status of the candidate species, and, each year, the agency is required to issue a new 12-month finding updating the status of the candidate species. *Id*. § 1533(b)(3)(C)(i).[9]

## B.    Critical Habitat Designation Process

ESA Section 4 also directs the Secretary to designate "critical habitat," which is defined in the ESA as:

> (i)    the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
>
> (ii)    [the] specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

*Id*. § 1532(5)(A). Any designation of critical habitat must be based on the "best scientific data available" and "tak[e] into consideration the economic impact, the impact on national security, and any other relevant impact" of the designation. *Id.* § 1533(b)(2).

To the "maximum extent prudent and determinable," the Secretary must designate such critical habitat concurrently with a determination that a species is threatened or endangered. *Id.* §

---

[8] In the event of an "emergency posing a significant risk to the wellbeing of any species of fish or wildlife or plants," the Secretary may bypass these listing procedures and issue regulations, including a listing, that take effect immediately upon publication in the Federal Register. *Id.* § 1533(b)(7). To issue an emergency regulation, the Secretary must publish "detailed reasons why such regulation is necessary," *id.* § 1533(b)(7)(A); 50 C.F.R. § 424.20, and notify the appropriate state agency in each state where the species is believed to reside, 16 U.S.C. § 1533(b)(7)(B). Any emergency regulation goes into effect immediately and remains effective for up to 240 days. *Id.*

[9] FWS publishes these annual findings in a Federal Register document known as the Candidate Notice of Review. *See, e.g.*, 88 Fed. Reg. 41,560 (June 27, 2023).

1533(a)(3)(A)(i). The concurrent designation of critical habitat at the time of a species' listing, however, is not required in two instances. First, the Secretary may find that the designation of critical habitat "would not be prudent" if, for example, it would increase the threat of takings to the species or would not be beneficial to the species. 50 C.F.R. § 424.12(a)(1); *see also* 84 Fed. Reg. 45,020, 45,040-43 (Aug. 27, 2019) (discussing other "circumstances in which . . . it would not be prudent to designate critical habitat because it would not benefit the species"); 49 Fed. Reg. 38,900, 38,903 (Oct. 1, 1984) (stating that designation is not prudent when "the possible adverse consequences would outweigh the benefits of designation"). Second, the Secretary may find that critical habitat is "not determinable" if information sufficient to perform the required analysis of impacts from the designation is lacking, or if the biological needs of the species are not sufficiently well known to permit identification of an area as critical habitat. *See* 50 C.F.R. § 424.12(a)(2). In the event of a "not determinable" finding, the Secretary may postpone designating critical habitat, but a final designation of critical habitat "based on such data as may be available at that time," and "to the maximum extent prudent," must be completed no later than two years after the proposed listing determination. 16 U.S.C. § 1533(b)(6)(C)(ii).

### C.    The National Listing Workplan

Historically, the Service has received many more petitions to list, delist, or reclassify species than the resources necessary to implement the ESA, thereby leading to a backlog of outstanding listing determinations.[10] To address this backlog, the Service developed, through notice-and-comment rulemaking, a methodology for prioritizing petition findings as well as candidate species. *Methodology for Prioritizing Status Reviews and Accompanying 12-Month Findings on Petitions for Listing under the Endangered Species Act*, 81 Fed. Reg. 49,248 (July 27, 2016) ("Prioritization Methodology"). Along with the Prioritization Methodology, the Workplan accounted for other factors, such as "annual available funding, staffing resources, non-

---

[10] Benjamin Jesup, *Endless War or End this War? The History of Deadline Litigation Under Section 4 of the Endangered Species Act and the Multi-District Litigation Settlements*, 14 Vt. J. Env't L. 327, 341 (2013) (explaining that, the Service's "budget for the listing program has never been sufficient to address the entire backlog" of petitions).

discretionary requirements such as court orders and settlement agreement requirements, and the listing priority numbers of existing candidate species." *Id*. at 49,250. The Service stated that it would use the Prioritization Methodology to develop a multi-year national listing workplan and that it would "periodically update [the Workplan] as circumstances warrant." *Id*. at 49,248. In September 2016, the Service made public and posted on its website the first National Listing Workplan identifying the actions it anticipated completing within the next seven years. The Service subsequently posted an updated Workplan—this time going out five years—in May 2019, and has since updated the Workplan on four separate occasions, most recently in April 2023. The Workplan enables the Service to order its workload based on the needs of candidate and petitioned species, while providing state wildlife agencies, nonprofit organizations, and other diverse stakeholders and partners with greater clarity and transparency about the timing of listing determinations, with the goal of encouraging proactive conservation so that federal protections are not needed in the first place.

## FACTUAL BACKGROUND[11]

I.     **The Service has made positive 90-day findings for each of the species at issue in this action.**

In all, Plaintiff's complaint alleges that the Service is late in making listing or critical habitat determinations for 241 species. *See* ECF No. 1 ¶¶ 2-5. Following the resolution of Defendants' motion for partial dismissal, subsequent efforts to settle Plaintiff's claims, and the

---

[11] Plaintiff's claims are reviewed pursuant to the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *Gerber v. Norton*, 294 F.3d 173, 178 n.4 (D.C. Cir. 2002) (citing *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982)). Under the APA, the Court neither sits as an evidentiary fact finder, nor resolves alleged disputed facts. *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985) (in an APA action, "there is no disputed facts that the district court must resolve."). Thus, LCvR 7(h) does not apply and the assertions of fact in Plaintiff's Complaint, its Motion for Summary Judgment, and its supporting materials thereto, are not relevant to the judicial review sought in this action. Nonetheless, Defendants have responded to Plaintiff's Statement of Undisputed Material Facts and prepared their own separate Statement of Undisputed Fact in addition to the factual background offered here.

Service's progress in publishing 12-month findings outside of litigation, only 80 species remain subject to the parties' cross-motions for summary judgment. For each of these 80 species, the Service has issued a 90-day finding that the listing petition presents substantial information indicating that listing may be warranted, but it has not yet issued 12-month findings. *See* Defendants' Answer, ECF No. 59 ¶¶ 52, 62, 92, 127. These remaining 80 species all fall under Plaintiff's first claim, and Plaintiff's second and third claims (challenging missed deadlines for final listing determinations and critical habitat) are moot. *See* ECF No. 1 at 59-60. *See Conservation Force v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (holding that completion of 12–month finding "render[ed] moot the appellants' challenges to [FWS's] failure to publish such a finding"); *Conservation Force v. Salazar*, 851 F. Supp. 2d 39, 45 (D.D.C. 2012) (holding that claims for "failure to make the requisite 12–month finding" and "failure to conduct a five-year review" were moot because "the combined 12–month and five-year review has been completed"); *Biodiversity Legal Found. v. Norton*, 285 F.Supp.2d 1, 12 (D.D.C. 2003) (holding that claim challenging the use of listing priority guidance in petition findings was moot because, "[r]egardless of whether FWS utilized [this guidance] in making the 90-Day Finding or the 12-Month Finding . . . FWS has since published both notices").[12]

## II.   The Service continues to make diligent progress towards completing listing determinations in accordance with its National Listing Workplan.

Since Plaintiff filed its suit in February 2020, the Service has worked diligently to collect the information necessary to make scientifically defensible findings for each of the 241 species outlined in Plaintiff's complaint. Indeed, the Service has made steady progress on the work

---

[12] There are exceptions to the mootness doctrine, *see, e.g.*, *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 321 (D.C. Cir. 2009) (describing two exceptions where "the specific claim … [is] capable of repetition, yet evading review, or falls within the voluntary cessation doctrine") (citations and quotations omitted), but no exception applies under these circumstances. *Cf. Conservation Force*, 733 F.3d at 1204 (dismissing 12-month finding claim without considering mootness exceptions).

outlined in its Workplan during this time. To wit, the Service has published 110 of the 241 findings over the last three years (while an additional 30 species petitions were voluntarily withdrawn)—a period which includes both the current administration and the tail end of the previous administration.

The current Workplan—recently updated in April 2023 and projecting out to 2027—provides timelines for 235 12-month findings (either a finding that the petitioned action is warranted, accompanied by a proposed listing rule if the petitioned action is to list or reclassify a species; a finding that the petitioned action is not warranted; or a finding that the petitioned action is warranted but precluded by higher-priority actions), nine discretionary status reviews, one proposed listing rule, three final listing rules, 48 proposed critical habitat rules, and one final critical habitat rule. *See* Ex. A—National Listing Workplan.

## STANDARD OF REVIEW

Plaintiff brings this action under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and the APA, 5 U.S.C. § 706. The ESA's citizen-suit provision authorizes a private party to sue "where there is alleged a failure of the Secretary to perform any act or duty under [ESA Section 4] which is not discretionary." 16 U.S.C. § 1540(g)(1)(C). The lawsuit must seek to "compel [the Secretary] to perform a nondiscretionary duty under § 1533." *See Bennett v. Spear*, 520 U.S. 154, 173 (1997). Likewise, the APA allows courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Such a claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 64 (2004) (emphasis in original).

Plaintiff's claim that the Secretary has failed to comply with the ESA is reviewed under the standards of review provided in the APA. *Las Vegas v. Lujan*, 891 F.2d 927, 932 (D.C. Cir.1989); *see also Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011). Under the APA, "[s]ummary judgment is an appropriate procedure for resolving a challenge" to a federal agency's actions. *Bloch v. Powell*, 227 F. Supp. 2d 25, 31 (D.D.C. 2002) (quoting *Fund*

*for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995), *amended*, 967 F. Supp. 6 (D.D.C. 1997)). When considering a summary judgment motion, the district court "sits as an appellate tribunal" and "the entire case . . . is a question of law." *Am. Bioscience v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

## ARGUMENT

## I.      Plaintiff lacks standing to bring claims with respect to 18 species.

"A plaintiff must demonstrate standing for each claim [it] seeks to press" and "for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006). Of Plaintiff's three original claims, only the first remains live (*see supra* at 9); however, that single claim challenges the Service's failure to make timely 12-month findings on petitions to list what are now 80 different species (*see supra* at 1 n.1), and Plaintiff asks the Court to order the Service to make findings for each of these 80 species within twelve months.[13] ECF No. 1 at 59-60; ECF No. 60-2; Pl.'s Mem. at 27, 53. To maintain this claim and be eligible for the requested relief, Plaintiff must separately establish standing for each of the 80 alleged failures to make timely findings. *See CBD v. U.S. DOI*, No. 22-CV-01716 (TSC), 2023 WL 7182041, at *3 (D.D.C. Nov. 1, 2023) ("Plaintiffs must prove separate standing as to each agency action challenged." (internal quotations omitted)).

To establish standing, a plaintiff must prove it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical"; that there is "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant"; and that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). These requirements apply even when the injury complained of is procedural, for "the omission of a

---

[13] Plaintiff has asserted no claim sufficient to support its request for a broad declaratory judgment as explained *infra*, nor has it provided any evidence to establish its standing to seek such relief. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) ("Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions.").

procedural requirement does not, by itself, give a party standing to sue." *Food & Water Watch v. Vilsack*, 808 F.3d 905, 921 (D.C. Cir. 2015). "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.,* 555 U.S. 488, 496 (2009). Relatedly, "although it is true that the redressability requirement is 'relaxed' for plaintiffs asserting procedural injuries, 'relaxed' does not mean erased." *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 170 F. Supp. 3d 6, 15 (D.D.C. 2016). A plaintiff must still show that "the harm to plaintiff['s] concrete interest" could be redressed. *Id.*

Where a plaintiff is an organization, it can maintain a claim by proving it has either associational standing to sue on behalf of its members or organizational standing to sue on its own behalf. Plaintiff alleges it has organizational standing to bring challenges on its own behalf for missed deadlines on petitions to list 73[14] species. Pl.'s Mem. at 31-32, 34. Plaintiff also alleges it has associational standing to challenge the Service's missed deadlines to respond to petitions to list 85[15] species, regardless of who petitioned to list those species. *See* Pl.'s Mem. at 31-32. However, Plaintiff has failed to establish that it has organizational standing to challenge *any* missed petition deadlines, and, at a minimum, it has not shown associational standing to maintain challenges to missed deadlines for petitions to list at least 14 species. When taken together, this

---

[14] Plaintiff incorrectly asserts that it filed petitions to list 73 species. *See* Pl.'s Mem. at 34 n.19. In fact, Plaintiff did not submit the petition to list the Pinaleno talussnail (*Sonorella grahamensis*)—WildEarth Guardians did. Regardless, the Service submitted a 12-month finding for this species on December 15, 2023, so Plaintiff's claim for this species is now moot, as are Plaintiff's claims regarding 5 more of these 73 species. *Compare* Pl.'s Mem. at 34-35 n.19 (identifying petitions to list Florida pinesnake, Hubricht's cave beetle, Northern cavefish, Silken cave beetle, Western spadefoot toad, and Pinaleno talussnail, among others) *with* Footnote 1, *supra* (identifying Federal Register notices for same six species). Accordingly, of the 73 missed deadlines for which Plaintiff asserts it has organizational standing, only 67 remain at issue.

[15] Plaintiff asserts that it has associational standing "as to 85 of the remaining species at issue[.]" Pl.'s Mem. at 31-32. Again, as noted in Footnote 1, *supra*, the Service published 12-month findings on petitions to list 9 of the 85 species for which Plaintiff asserts associational standing, effectively mooting those challenges, leaving 76 of the original 85 species at issue.

means Plaintiff lacks standing to challenge missed deadlines for petitions to list at least 18[16] of the 80 species still at issue, as explained in detail below. Therefore, the Court should narrow Plaintiff's claim and corresponding requested relief accordingly.

### A. Plaintiff lacks organizational standing to challenge any missed petition deadlines.

For an organization to have standing to pursue claims on its own behalf, "like an individual plaintiff," it must "show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Food & Water Watch*, 808 F.3d at 919 (internal quotations omitted). This means "[a]n entity may establish organizational standing if it alleges 'concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's activities—[that] constitutes far more than simply a setback to the organization's resources.'" *CBD v. U.S. DOI*, 2023 WL 7182041, at *3 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). "An entity's abstract interest in a problem . . . is insufficient to establish standing, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem." *Id.* (internal quotations omitted).

Plaintiff wrongly asserts that it has organizational standing to challenge the Service's delay in responding to petitions it submitted based on alleged harm to "the Center's mission" and the need to "expend resources to counteract that harm." Pl.'s Mem. at 34-35. First, Plaintiff cannot rely solely on alleged harm to its mission because "frustration of an organization's objectives" is the type of "abstract concern" that the D.C. Circuit has expressly found insufficient to establish standing. *Food & Water Watch*, 808 F.3d at 919. Just last month this Court found similar

---

[16] These species are the Chisos coralroot (*Hexalectris revolute*), Ciliate-leaf tickseed (*Coreopsis integrifolia*), Dukes' skipper (*Euphyes dukesi calhouni*), Ferris's copper butterfly (*Lycaena rubidus ferrisi*), Florida Hartwrightia (*Hartwrightia floridana*), Godfrey's stitchwort (*Minuartia godfreyi*), Harper's fimbristylis (*Fimbristylis perpusilla*), Logan's Agarodes caddisfly (*Agarodes logani*), Oregon Vesper Sparrow (*Pooecetes gramineus ssp. affinis*), Piebald madtom (*Noturus gladiator*), Raven's seedbox (*Ludwigia ravenii*), Sevier snowfly (*Allocapnia brooksi*), Spot-tailed earless lizard (*Holbrookia lacerate*), Streamside salamander (*Ambystoma barbouri*), Sykora's Hydroptila (*Hydroptila sykorai*), Tennessee forestfly (*Amphinemura mockfordi*), Texas salamander (*Eurycea robusta*), and the Thin-wall quillwort (*Isoetes microvela*).

allegations from this same Plaintiff insufficient to establish organizational standing in a case challenging federal agency approvals of over 4,000 applications for permits to drill. *CBD v. U.S. DOI*, 2023 WL 7182041, at *4 (finding Plaintiff lacked organizational standing despite its allegations that "protecting listed species is at the heart of the Center's organizational missions" and that defendants' "conduct frustrates that mission and requires the Center to divert and expend resources to address impacts of these oil and gas drilling operations on listed species and public lands.").

Plaintiff's generalized assertion that it was "forced . . . to expend resources to counteract th[e] harm" caused by missed petition deadlines fares no better. Pl.'s Mem. at 35; *see also id.* at 37. To prove standing at the summary-judgment stage, a plaintiff cannot rest on "mere allegations" but must "set forth by affidavit or other evidence specific facts." *Lujan*, 504 U.S. at 560-61 (citations and quotations omitted). While Plaintiff contends it has organizational standing to challenge missed deadlines for petitions to list 73 species, the evidence it relies on in its brief alleges an expenditure of resources related to petitions to list just nine of those species. Pl.'s Mem. at 37-38 (citing Decl. of Patrick Donnelly ("Donnelly Decl."), ECF No. 60-56, and Decl. of Elise Pautler Bennett ("Bennett Decl."), ECF 60-34, (declarations for allegations regarding eight Nevada springsnails[17] and the spotted turtle, respectively)). Similarly, to support its allegation that "diverted resources have real costs," Plaintiff only cites evidence related to petitions to list those same nine species. Pl.'s Mem. at 38 (citing Donnelly Decl. and Bennett Decl.).[18] And, although

---

[17] These are the Elongate-gland springsnail (*Pyrgulopsis isolatus*), Sterile Basin pyrg (*Pyrgulopsis sterilis*), and the six Steptoe Valley springsnails (Flat-topped Steptoe pyrg (*Pyrgulopsis planulata*), Landyes pyrg (*Pyrgulopsis landyei*), Neritiform Steptoe Ranch pyrg (*Pyrgulopsis neritella*), Northern Steptoe pyrg (*Pyrgulopsis serrata*), Southern Steptoe pyrg (*Pyrgulopsis sulcate*), and the Sub-globose Steptoe Ranch pyrg (*Pyrgulopsis orbiculata*). Donnelly Decl. ¶ 10.

[18] The Bennett declaration also contains allegations regarding the Florida pinesnake, but the Service made a finding on Plaintiff's petition to list that species on November 29, 2023, thereby mooting any challenge related to it. 88 Fed. Reg. 83,368. Similarly, Plaintiff also cites a declaration from Ileene Anderson (ECF No. 60-39), but it only contains species-specific allegations regarding the Western spadefoot toad petition, on which the Service issued a finding on December 5, 2023, also mooting Plaintiff's claim regarding that species. 88 Fed. Reg. 84,252.

Plaintiff generally alleges that a diversion of resources caused by missed petition deadlines has harmed its efforts to protect other imperiled species, Plaintiff's only specific evidence of any such diversion causing alleged harm is again related only to these same nine species. *Id.*

"Standing is not dispensed in gross," regardless of how a plaintiff styles its claim. *TransUnion LLC*, 141 S. Ct. at 2208. To have organizational standing to challenge missed deadlines for each of the petitions that it filed, Plaintiff should have provided evidence demonstrating a concrete injury that Plaintiff itself suffered caused by each of the Service's overdue findings. *CBD v. U.S. DOI*, 2023 WL 7182041, at *4. Plaintiff cannot extrapolate its organizational standing in connection with just nine species in order to challenge missed deadlines for an additional 56 petitions it filed, while merely relying on the latter as "examples" of its organizational standing Pl.'s Mem. at 36; *see CBD v. U.S. DOI*, 2023 WL 7182041, at *4 (rejecting Center for Biological Diversity's efforts to establish organizational standing by "aggregating the anticipated harms of more than 4,000 [drilling permit] approvals"). Nor can Plaintiff rely on generalized allegations like those cited from the Declaration of Noah Greenwald, Pl.'s Mem. at 37, that fail to identify any specific diversion of resources related to a specific petition, or any specific activity that was impeded by that specific diversion. *See, e.g.,* ECF No. 60-24 ¶ 28 ("[A]ny of my time spent tracking species for which the Center has already petitioned is time that I cannot spend protecting other species."); *CBD v. U.S. DOI*, 2023 WL 7182041, at *4; *Lujan*, 504 U.S. at 560-61. At best, Plaintiff has adequately established that the Service's missed deadlines to respond to petitions to list nine species caused some diversion of resources for two declarants (Donnelly Decl. and Bennett Decl.). Plaintiff has not, however, shown that this alleged diversion was a "drain on the organization's activities—[that] constitutes far more than simply a setback to the organization's resources," as required to establish organizational standing. *CBD v. U.S. DOI*, 2023 WL 7182041, at *3.

Nor has Plaintiff shown that if these species were listed, the alleged expenditure of resources would cease, redressing the harm that Plaintiff alleges. *See Nat'l Wildlife Fed'n*, 170 F. Supp. 3d at 16 (finding plaintiffs lacked standing because "[t]he concrete and particularized

injuries asserted by the conservation groups and their members rest on aesthetic harms from [the challenged] projects that will remain unchanged by any correction of procedural errors."). Although Plaintiff makes general allegations that time spent "monitoring the status of species for which it has petitioned" has taken away from time it could have spent on other work (Pl.'s Mem. at 37), its declarations include contradictory allegations that show the declarants would still expend resources by visiting remote areas, looking for species, and even tracking them, regardless of whether the Service has issued 12-month findings. *See, e.g.,* Donnelly Decl. ¶ 2 (declarant "regularly conducted surveys for rare and endangered species for 9 years"); *id.* ¶ 3 (declarant "monitor[s] government action involving public lands and endangered species in Nevada" as part of job); *id.* ¶ 11 (declarant "love[s] the desert" and finds "[e]xploring the desert, including remote desert basins . . . continually rewarding"); id. ¶ 19 (declarant visits Ash Meadow area where springsnail exists "on a monthly basis, as [he has] for nine years" because declarant "enjoy[s] walking the boardwalks . . . or wandering down the old, closed dirt roads and levees," "photographing rare wildflowers," and "sit[ting] in quiet contemplation at the cerulean blue springs and listen[ing] to the magic of water flowing through the desert); *id.* ¶ 20 (declarant works for "conservation of the Amargosa River" that is "intended to benefit the whole suite of biodiversity along the Amargosa River" and is "not exclusively for the benefit of *P. isolata.*")*;* Greenwald Decl. ¶ 10 ("The Center maintains a database of listing and critical habitat decisions from the Federal Register."); *id.* ¶ 11 ("For each species listed, we have also tracked whether such listings occurred on the Service's own initiative or followed a petition or lawsuit"); *id.* ¶ 14 (declarant has "review[ed] the decision files for dozens of listing determinations over the years"); *id.* ¶ 20 ("declarant has "maintained a database of the findings planned under the Workplan and Workloads"). Moreover, as described further below, Plaintiff has a longstanding history of expending resources in litigation challenging the substance of the Service's Section 4 listing determinations.

For all these reasons, Plaintiff has failed to establish that it has organizational standing to maintain its claim to challenge any missed petition deadlines. Although Plaintiff asserts that it also

has associational standing to bring challenges to most of the missed deadlines for petitions that it filed, Plaintiff relies exclusively on a claim of organizational standing for its challenges related to petitions to list four species: the Florida Hartwrightia (*Hartwrightia floridana*), Harper's fimbristylis (*Fimbristylis perpusilla*), Sevier snowfly (*Allocapnia brooksi*), and Thin-wall quillwort (*Isoetes microvela*). *See* Pl.'s Mem. at 31 (claiming associational standing for 85 of what were then 89 species at issue); *compare id.* n.1 (identifying all species then at issue) *with id.* at 31-32 n.17 (identifying "associational standing" petitions) *and id.* at 34-35 n.19 (identifying "organizational standing" petitions).  Plaintiff provided no declarations that specifically address or even identify these 4 species, nor does it discuss them anywhere in its brief, including in its organizational standing argument. Therefore, the Court should reject Plaintiff's challenge to these four petitions based on Plaintiff's failure to establish organizational standing alone.

### B.   Plaintiff lacks associational standing to challenge missed deadlines on petitions to list at least 14 different species.

Plaintiff argues that it has associational standing to challenge the Service's missed deadlines to respond to petitions to list what are now 76 species, *see supra* n.15, regardless of who petitioned to list the species originally. This includes 12 species[19] for which Plaintiff relies exclusively on a claim of associational standing (and not also organizational standing as Plaintiff did not petition to list these species).

"An association has standing to sue on behalf of its members if: '(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit.'" *Chamber of Com.*

---

[19] These are the Big red sage (*Salvia penstemonoides*), Brush pea (*Genistidium dumosum*), Chisos coralroot (*Hexalectris revolute*), Edward's Aquifer diving beetle (*Haideoporus texanus*), Ferris's copper butterfly (*Lycaena rubidus ferrisi*), Golden winged-warbler (*Vermivora chrysoptera*), Oregon Vesper sparrow (*Pooecetes gramineus ssp. affinis*), Spot-tailed earless lizard (*Holbrookia lacerate*), Texas salamander (*Eurycea robusta*), Tharp's bluestar (*Amsonia tharpii*), Western bumblebee (*Bombus occidentalis*), and White Sands pupfish (*Cyprinodon tularosa*). *Compare* Pl.'s Mem. at 31-32 n.17 *with id.* at 34-35 n.19.

*of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (quoting *Sierra Club v. EPA,* 292 F.3d 895, 898 (D.C. Cir. 2002)). As with organizational standing, Plaintiff must "set forth by affidavit or other evidence specific facts" showing that it meets these associational standing requirements. *Lujan*, 504 at 560-61.

Plaintiff asserts that it "has individual standing declarations" for 85 species, Pl.'s Mem. at 31-32 n.17, and that these declarations broadly show "the Center's members have standing to sue in their own right because the Service's delay in protecting these species harms the Center's members' scientific, recreational, conservation, aesthetic, and other interests in those species and the Center's members['] ability to observe them in their natural habitats," *id*. at 31-32. However, Plaintiff does not identify which declaration(s) allegedly discuss(es) each species, forcing Defendants (and ultimately the Court) to perform a scavenger hunt to assess the veracity of Plaintiff's assertions. This exercise is further complicated by Plaintiff's failure to explain why it has associational standing to challenge the vast majority of missed deadlines for the remaining 76 species, given that Plaintiff again relies on only a handful of examples to support its broad arguments. Specifically, Plaintiff's associational standing arguments reference just six species, one of which is now moot, to support its standing to challenge missed petition deadlines for 76 species. Pl.'s Mem. at 32-33 (citing three declarants' discussions of Blanding's turtle, Florida pine snake (now moot), wood turtle, spotted turtle, Tallaposa orb, and Arizona Toad). As with organizational standing, such generalizations and inference are insufficient to establish associational standing. *See, e.g., CBD v. U.S. DOI*, 2023 WL 7182041, at *4.

Moreover, for at least 14 species, Plaintiff's declarations fail to establish that the declarants would have standing to sue in their own right:

1. **Chisos coralroot (*Hexalectris revolute*):** The declarant (Declaration of Grant Gourley ("Gourley Decl."), ECF No. 60-37) states, "I travel to the Chisos coralroot's habitat approximately once every five years with the goal of observing it." ¶ 6. However, it is irrelevant for standing purposes whether a declarant has visited a species' habitat in the past, as such past visits are not evidence of the requisite actual or imminent injury. *Lujan,* 504 U.S. at 564 ("That

the women 'had visited' the areas of the projects before the projects commenced proves nothing" when evaluating standing). Nor is a declarant's "profession of an 'intent' … [to] visit[ ]" a location "enough." *Id.* "Such 'someday' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury" required to show standing. *Id.* The only specific future plan the declarant provides is an intention "to backpack in the Guadalupe Mountains in New Mexico or Texas later this fall or winter." Gourley Decl. ¶ 6. However, this species spends most of its life underground as a rhizome (10-16 years), sends up a shoot and flowers in the spring, and then dies back later that same year. *See* Exhibit B, Declaration of Gary Frazer ("Frazer Decl.") ¶ 35. Therefore, the declarant's plans to backpack in the fall or winter would not provide the declarant with an opportunity to view this species, regardless of whether it was listed under the ESA.

2. **Logan's Agarodes caddisfly (*Agarodes logani*):** The declarant (Decl. of Jeff Steven Glitzenstein ("Glitzenstein Decl."), ECF No. 60-41) states, "I learned about the Logan's Agarodes caddisfly and Sykora's Hydroptila caddisfly *recently*" (*id.* ¶ 6, emphasis added) but does not specify when exactly, or when the declarant's interest in the species developed. Standing is determined based on the facts as they existed when the action commenced and must continue to exist throughout the litigation. *See, e.g., Lujan*, 504 U.S. at 571 n.4 ("[J]urisdiction is to be assessed under the facts existing when the complaint is filed); *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732-33 (2008) ("[I]t is not enough that the requisite interest exist at the outset. To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."); *La Botz v. Fed. Election Comm'n*, 61 F. Supp. 3d 21, 28 (D.D.C. 2014) ("Whether a plaintiff has standing is determined at the time the suit commences"). Plaintiff filed its complaint over three years ago. *See* ECF No. 1. This declaration does not establish that the declarant had an interest in this species that could support a standing claim when the case was first filed. Additionally, the declarant states, "I am planning several trips to the Roth property in Gadsden County, and I intend to . . . investigate the potential occurrence of the Logan's Agarodes caddisfly." Glitzenstein Decl. ¶ 6. However, this species appears to be

restricted to one stream in Gadsden County and is not found on the Roth property. Frazer Decl. ¶ 33. Therefore, the declarant could not investigate the species during a future visit to the Roth property, regardless of whether the species was listed under the ESA.

3. **Sykora's Hydroptila (*Hydroptila sykorai*):** This species, and its supporting declaration, suffers from the same timeliness issue as the Logan's Agarodes caddisfly, explained above. Also, the same declarant states, "I intend to search for and try to observe the Sykora's Hydroptila caddisfly." Glitzenstein Decl. ¶ 6. However, this species is a microcaddisfly that only reaches a length of 2mm and cannot be identified by sight without a microscope. Frazer Decl. ¶ 33. The declarant expresses no intention to use a microscope to try to observe the species at any time. Therefore, the declarant could not observe the species regardless of the declarant's plans or whether the species was listed under the ESA.

4. **Raven's seedbox (*Ludwigia ravenii*):** The declarant (Declaration of Kelley Dennings, ECF No. 60-45) states, "I visit the North Carolina habitat of the ciliate-leaf tickseed and Raven's seedbox. My next trip is scheduled for December 2023," and "[w]hile there, I intend to search for the ciliate-leaf tickseed and Raven's seedbox." *Id*. ¶ 6. This is the only mention of specific, future plans to visit this species and may have already occurred, which is insufficient to establish standing for forward looking relief. *Lujan,* 504 U.S. at 564. Additionally, this species is dormant and not identifiable from frost in December. Frazer Decl. ¶ 33. Therefore, the declarant could not observe the species regardless of the declarant's plans or whether the species was listed under the ESA.

5. **Ciliate-leaf tickseed (*Coreopsis integrifolia*):** This species, and its supporting declaration, suffers from the same flaws as described above with the Raven's seedbox. Additionally, this species is primarily found on the roadsides of private lands and is mostly dormant during the winter and unidentifiable after the first hard freeze. Frazer Decl. ¶ 33. Therefore, the declarant could not observe the species regardless of the declarant's plans and whether the species was listed under the ESA.

6. **Oregon Vesper Sparrow (*Pooecetes gramineus ssp. affinis*):** The declarant states,

"I recently visited the habitat of the Oregon vesper sparrow," (Greenwald Decl. ¶ 30) but he identifies no future plans to attempt to view the species. The declarant also states, "[m]y interest in the species in this suit, including the Oregon vesper . . . is deeply harmed by the Service's ongoing delay of protection of these species" (*id.* ¶ 33) but does not identify with any specificity how such harm specifically related to the Service's failure to respond to the Oregon vesper petition would be caused.

       7.      **Streamside salamander (*Ambystoma barbouri*)**: The declarant (Declaration of Tierra Curry, ECF No. 60-65) states, "I will look for adults in Kentucky and in Tennessee in late fall 2023" (*id.* ¶ 44), but "late fall 2023" has passed, and the declarant includes no other concrete future plans to attempt to view the species.

       8.      **Piebald madtom (*Noturus gladiator*)**: The declarant (Declaration of Bernard Kuhajda, ECF No. 60-26) signed the declaration in June 2023 and states, "[l]ater this summer, I will travel [ ] to Terrapin Creek State Nature Preserve in Kentucky to see if we can observe and collect a piebald madtom in Kentucky habitat." *Id.* ¶ 8. Summer 2023 is over, and the declarant identifies no other concrete future plans to attempt to view the species.

       9.      **Spot-tailed earless lizard (*Holbrookia lacerate*)**: The declarant (Declaration of Drew R. Davis, ECF No. 60-33) signed the declaration in September 2023 and states, "I plan to return this fall to search for the spot-tailed earless lizard and other reptiles." *Id.* ¶ 6. Again, Fall 2023 has passed, and the declarant identifies no other concrete future plans to attempt to view the species.

      10.     **Ferris's copper butterfly (*Lycaena rubidus ferrisi*)**: The declarant (Declaration of Russ McSpadden, ECF No. 60-58) signed the declaration in June 2023 and states, "I plan to visit the high elevation meadows of the White Mountains again this summer with my son. We want to observe Ferris's copper butterflies again and observe their behavior. We plan to go in July and in August once the monsoon rains arrive." *Id.* ¶ 8. Summer 2023, including July and August 2023, has passed, and the declarant identifies no other concrete future plans to attempt to view the species.

11. __Godfrey's stitchwort (*Minuartia godfreyi*)__: The declarant (Declaration of Dennis Earl, ECF No. 60-31) states, "I recently learned about Godfrey's stitchwort" (*id*. ¶ 6) but does not specify when the declarant's interest in the species actually developed. Standing must exist at all times during litigation, including when the complaint is filed. *Lujan*, 504 U.S. at 571 n.4; *La Botz*, 61 F. Supp. 3d at 28. This declaration does not establish with specificity that the declarant had an interest in this species that could support a standing claim when the case was first filed over three years ago (ECF No. 1).

12. __Tennessee forestfly (*Amphinemura mockfordi*)__: The declarant (Declaration of Cynthia Elkins, ECF No. 60-35) signed the declaration in November 2023 and states, "I only learned about the Tennessee forestfly earlier this year," (*id*. ¶ 6) meaning the declarant's interest in this species could not have developed before 2023, and certainly not before Plaintiff filed its complaint in 2020.

13. __Dukes' skipper (*Euphyes dukesi calhouni*)__: The declarant states, "*As my schedule permits*, I visit Dukes' skipper habitat in the Tide Swamp Unit of Big Bend Wildlife Management Area *most years* during the months of April, May, August, and September to survey for the butterfly. I *hope* to visit the Tide Swamp Unit of Big Bend again in the spring and fall of 2024 … Though less frequent, when I visit peninsular Florida once or twice each year, I *sometimes* plan my travel route so that I can stop at sites where the Dukes' skipper has been observed." *Id*. ¶ 8 (emphasis added). These vague intentions and "hopes to visit" are far from the concrete and specific plans required to establish standing. *See Lujan*, 504 U.S. at 564; *Summers*, 555 U.S. at 495.

14. __Texas salamander (*Eurycea robusta*)__: The declarant (Declaration of Juliet Whitsett, ECF No. 60-43) states, "I have . . . created art based on . . .a blind salamander . . . similar to the Texas salamander," and "I intend to create future artwork that incorporates the life cycle of . . . the Texas salamander." *Id*. ¶ 13. However, the declarant does not explain how any delay in listing this species in any way impacts the declarant's ability to create such art. The declarant also says, "I intend to return to the Texas troglobitic water slater, mimic cavesnail, and Texas

salamander's habitat frequently, at least once every 2-3 years" (*id*. ¶ 15), but identifies no concrete plans to do so, including particular locations or timeframes, which is not enough to establish standing. *See Lujan,* 504 U.S. at 564; *Summers*, 555 U.S. at 495 (finding general intention to visit unnamed national forests insufficient for standing).

The declarations offered in support of the species identified above include a raft of deficiencies. These flaws are fatal to Plaintiff's ability to adequately establish associational standing for its members to challenge missed deadlines for petitions to list at least 14 species. *See CBD v. U.S. DOI*, 2023 WL 7182041, at *4. Accordingly, the Court should narrow Plaintiff's last remaining claim and decline to award any relief related to the petitions to list these 14 species.

## II.     For those species for which Plaintiff has demonstrated standing, the Court has broad equitable discretion with respect to injunctive relief.

### A.     Courts have broad discretion even where a statutory deadline is involved.

There is no question that this Court has discretion to enter the remedy requested by the Service.[20] In a suit alleging a violation of a congressionally mandated duty, the district court exercises its discretion to fashion a remedy by considering whether "the official involved … has in good faith employed the utmost diligence in discharging his statutory responsibilities." *Nat. Res. Def. Council v. Train* ("*Train*"), 510 F.2d 692, 713 (D.C. Cir. 1974). Courts have consistently noted that "'[f]lexibility rather than rigidity has distinguished' equity jurisprudence," and that a "court may forebear the issuance of an order in those cases where it is convinced by the official involved that he has in good faith employed the utmost diligence in discharging his statutory responsibilities." *Id.* at 713 (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)). The Court is "in essence, [ ] called on to separate justifications grounded in the purposes of the Act from the foot-dragging efforts of a delinquent agency." *Id.* at 713. "The sound discretion of [a] … court

---

[20] Indeed, although Defendants do not advance the argument here, numerous courts have held that a missed statutory deadline does not compel the Court to automatically issue injunctive relief. *See, e.g.*, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-13 (1982); *W. Coal Traffic League v. Surface Transp. Bd.*, 216 F.3d 1168, 1174-75 (D.C. Cir. 2000); *In re Barr Labs.*, 930 F.2d 72, 76 (D.C. Cir. 1991); *Mylan Pharms. v. Shalala*, 81 F. Supp. 2d 30, 47 (D.D.C. 2000); *In re Sw. Rsch. & Info. Ctr.*, No. 95-1285, 1995 WL 495948, at *1 (D.C. Cir. Aug. 14, 1995).

does not embrace enforcement … of a party's duty to comply with an order that calls [on] him 'to do an impossibility.'" *Id*. (citation omitted). Indeed, "it would be inappropriate to set an infeasible schedule in order to punish a delinquent agency." *Sierra Club v. Thomas*, 658 F. Supp. 165, 172 (N.D. Cal. 1987). Thus, a statutory deadline should not be enforced if it is impossible or infeasible to comply with such a deadline. *Am. Lung Ass'n v. Browner*, 884 F. Supp. 345, 347 (D. Ariz. 1994).

In *Train*, the leading case addressing an agency's failure to meet statutory deadlines, the D.C. Circuit recognized two types of circumstances that might necessarily delay agency action and make it infeasible to comply with a particular deadline: (1) budgetary and manpower constraints; and (2) the need for an agency to have more time to sufficiently evaluate complex technical and scientific issues. 510 F.2d at 712-13. With respect to the latter, "[t]he public has a significant interest in ensuring that the government does not [act] via a process that emphasizes expediency over quality and accuracy." *Cronin v. Browner*, 90 F. Supp. 2d 364, 373 (S.D.N.Y. 2000). In setting deadlines, courts have considered the agency's need for time to act in a manner that would withstand the scrutiny of subsequent challenge. *See Sierra Club v. Thomas*, 828 F.2d 783, 798-99 (D.C. Cir. 1987); *United Steelworkers of Am. v. Rubber Mfrs. Ass'n*, 783 F.2d 1117, 1120 (D.C. Cir. 1986) (holding judicial imposition of overly hasty timetable on agency would ill serve the public interest); *Me. Ass'n of Handicapped Persons v. Dole*, 623 F. Supp. 920, 926 (D. Me. 1985) (recognizing "the need to implement clear and effective regulations capable of withstanding the scrutiny of challenges following enactment").

In short, when an agency has missed a statutory deadline, a court should examine the relevant facts and circumstances and evaluate the time frame needed by the agency to make a well-reasoned, scientifically supportable, and defensible decision.

This is precisely what three separate Districts Courts—including this Court—did when they acknowledged the impossible task the Service is faced with and, ultimately, deferred to its National Listing Workplan after considering similar challenges by the Center for Biological Diversity and other plaintiff groups. *See Ctr. Biological Diversity v. U.S. Fish and Wildlife Service*,

No. 19-CV-354-TUC-JAS, 2020 WL 13865447, at *3 (D. Ariz. Nov. 24, 2020) (denying plaintiff's requested relief because "the FWS has limited funding, a heavy workload, rigorous scientific processes to uphold, and priority actions would be further delayed"); *Center for Biological Diversity v. Haaland*, No. 20-CV-1227-JLA, 2021 WL 4169567, at *9 (N.D. Ill. Sept. 14, 2021) (finding the Service's proposed deadline reasonable "considering the Service's budgetary constraints, manpower constraints, and other competing projects for higher-priority species and court-ordered actions."); *WildEarth Guardians v. Haaland*, No. 20-CV-1035-CKK, 2021 WL 4502054, at *10 (D.D.C. Sept. 30, 2021) (denying plaintiff's requested relief, finding "[d]efendants proposed remedy best balances the Service's competing priorities in light of practical limitations on its resources and better advances the ESA's overall purpose to protect endangered and threatened species"). Plaintiff does not—and indeed cannot—explain why these cases are any different from the matter at hand, or why this Court should depart from the direction another Judge in this District took just two years ago in *WildEarth Guardians*. That the present matter involves substantially more species than the cited cases only counsels further in favor of the Service's proposed remedy. If the courts mentioned above found it unworkable to impose plaintiffs' rigid timelines to issue 12-month findings for just a few species, there is even less reason to think such a remedy should be ordered for 80 different species.

### B.     The ESA does not constrain the Court's discretion.

The discretion of the Court in fashioning a remedy is quite broad unless a statute provides otherwise in a "clear and valid legislative command." *See United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496-97 (2001) (citation omitted). The Supreme Court has also noted that when a court is asked to enforce a statutory deadline, "the question before us concerns the consequences of the missed deadline where, as here, the statute does not specify them." *Dolan v. United States*, 130 S. Ct. 2533, 2538 (2010). In this case, the ESA's citizen-suit provision, which is the jurisdictional basis for Plaintiff's claims, does not clearly specify the consequences of a missed deadline. 16 U.S.C. § 1540(g)(1)(C) (providing district courts with the authority "to order

the Secretary to perform [an] act or duty [under section 4 which is not discretionary with the Secretary]" but not mandating the timeframe within which the Secretary must perform the act or duty). Specifically, "'Congress did not limit district courts' authority to provide equitable relief under the ESA, and indeed, specifically reserved their traditional authority to fashion appropriate equitable relief.'" *Colo. River Cutthroat Trout v. Kempthorne*, 448 F. Supp. 2d 170, 178 (D.D.C. 2006) (quoting *Defs of Wildlife v. Norton*, 239 F. Supp. 2d 9, 25 (D.D.C. 2002), vacated in part on other grounds, 89 Fed. Appx. 273 (D.C. Cir. 2004) (per curiam), citing 16 U.S.C. § 1540(g)(5)).[21]

III.   **The remedy proposed by the Service best preserves the benefits of its Workplan and best furthers the ESA's conservation goals.**

The Supreme Court has noted that when a court is asked to enforce a statutory deadline, a court should look "to statutory language, to the relevant context, and to what they reveal about the purposes that a time limit is designed to serve." *Dolan*, 130 S. Ct. at 2538. As for the language and purposes of the ESA and the relevant context, the Service's Workplan represents a thoughtful and balanced approach to implementing the ESA with limited resources. Plaintiff's proposed remedy cannot be carried out without disrupting this balance, setting back higher-priority listing actions (many under court order or settlement agreement), and producing rushed decisions that do not meet scientific and legal standards.

A.   **The Service's Workplan advances the goals of the ESA.**

The primary purpose of the ESA is to conserve threatened and endangered species and the ecosystems on which they depend. 16 U.S.C. § 1531(b). The substantive protections of the ESA do not apply unless a species is listed as threatened or endangered. *See id*. §§ 1533(d), 1536, 1538; *see also Tenn. Valley Auth. v. Hill* ("*TVA*"), 437 U.S. 153, 180 (1978). Statutory deadlines on listing petitions were added to the ESA out of a concern that "status reviews have often continued

---

[21] Other courts have maintained discretion in fashioning an appropriate remedy in ESA citizen-suit cases. *See, e.g. Contoski v. Scarlett*, Civil No. 05-2528 (JRT/RLE), 2006 WL 2331180, at *4 (D. Minn. Aug. 10, 2006) (noting that "the Court will consider the equities of the situation when determining the proper date"); *CBD v. Norton*, Civil No. 01-2101-IEGLAB, 2003 WL 22225620, at *4 (S.D. Cal. Sept. 9, 2003) (modifying deadlines due to the Service's funding levels).

indefinitely," and they were intended to "force action on listing and delisting proposals." H.R. Rep. No. 97-835, at *21 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2860, 2862. But the Service's Workplan (and its predecessor, the Multi-District Litigation Settlement Agreements ("MDL Agreements")) arose out of a widespread recognition that the system was failing to produce timely protections for species despite Congress's efforts to build mandatory deadlines into the process. A growing backlog of petition findings and candidate species precluded the Service from responding in a timely way to petitions at the beginning of the listing process, and consumed the resources that might have been used for adding species to the list of threatened and endangered species at the end of the listing process.

For example, between 2007 and 2010, the Service received 28 petitions seeking the listing of 1,187 species. Frazer Decl. ¶ 9. Between 2009 and 2010, 20 lawsuits were filed seeking to enforce nearly 800 listing petition deadlines. *Id*. ¶ 10. As a result, the system fell out of balance. The Service devoted most of its limited listing program resources to meeting deadlines on petition findings—many enforced through litigation. Minimal funding and resources were left to address candidate species (species found to warrant listing but for which development of a proposed rule was precluded by higher-priority listing actions). 75 Fed. Reg. 69,222, 69,224 (Nov. 10, 2010). By the end of 2010, there were 251 candidate species that had been found to warrant listing and were still awaiting proposed listing rules. Frazer Decl. ¶ 10. The Service sought to set priorities, addressing mandatory and court-enforceable deadlines, and the higher-priority candidate species as resources allowed. The same plaintiffs whose lawsuits seeking to enforce petition deadlines led to court orders or settlement agreements that left the Service with little funding for addressing candidate species also brought lawsuits charging that the Service was not making sufficient "expeditious progress" in developing proposed listing rules for the species on the candidate list. *See, e.g.*, Third Amended Compl., *Ctr. for Biological Diversity*, No. 1:04-cv-2026-GK (D.D.C. Nov. 7, 2005) (alleging that the Service violated the ESA because it was "making virtually no progress at all in adding concededly qualified species to the lists").

The Service set its priorities in the Workplan based in part on its Prioritization

Methodology, which underwent notice-and-comment rulemaking. Frazer Decl. ¶ 13. The Service cannot maintain the Workplan's balancing if it must devote disproportionate funding and staffing resources to making 90-day and 12-month petition findings, which are only the initial steps in the process and alone do not result in the listing of species and the accompanying extension of protections under the ESA. The Workplan allows the Service to allocate its limited resources appropriately so that the litigation-driven deadlines for petition findings do not again overwhelm the need for rulemakings to list the many species already found to warrant the protections of the ESA. In pursuit of that balance, the Workplan outlines work that each of the Service's eight Regional Offices need to complete over the next five years for 235 12-month findings (either a finding that listing is warranted, along with an accompanying proposed listing rule if the petitioned action is to list or reclassify a species; a finding that the petitioned action is not warranted; or a finding that the petitioned action is warranted but precluded by higher-priority actions), nine discretionary status reviews, one proposed listing rule, three final listing rules, 48 proposed critical habitat rules, and one final critical habitat rule. *See* Ex. A—National Listing Workplan.

As another federal district court recently explained, "[t]he Service's Workplan does not represent an arbitrary ranking choice. Rather, deciding which petitions and projects to address with the Service's limited resources requires a high level of technical expertise that courts best leave to the Service because those determinations are within its expertise." *Ctr. for Biological Diversity*, 2021 WL 4169567, at *8 (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)). And as another Judge in this District acknowledged, "[t]o interfere in that prioritization"—as Plaintiff here asks the Court to do—"would merely 'elevate the plaintiff's petition above other species, including those that the Service designates as a higher priority from a conservation standpoint.'" *WildEarth Guardians*, 2021 WL 4502054, at *10 (citing *Ctr. for Biological Diversity*, 2021 WL 4169567, at *8). The Court should decline to exercise its equitable discretion to produce such a result here.

### B. Plaintiff's proposed remedy cannot be achieved without undermining the goals of the Service's Workplan and the ESA.

Plaintiff proposes a remedy that will be impossible to achieve without (a) reallocating

resources away from the priorities identified in the Service's Workplan; and (b) undermining the purposes of the ESA by insisting on rushed findings that risk shoddy science. By setting deadlines, Congress made it clear that timely petition findings were important. But Congress also recognized that the system could be overloaded and directed the Service to "utilize a scientifically based priority system to list and delist species, subspecies, and populations based on the degree of threat, and proceed in an efficient and timely manner." H.R. Rep. No. 97-835, at *21 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2860, 2862. It further recognized the possibility that for some petitions, "the existence of pending or imminent proposals to list species subject to a greater degree of threat would make allocation of resources to such a petition unwise." *Id*. To prevent the potential overload of required listing actions from encroaching on the Service's other responsibilities, Congress imposed yearly spending caps on listing work by limiting appropriations authorized for that purpose. Frazer Decl. ¶¶ 4-8; *see also infra* at 34. The use of the Workplan to maintain balance and order in the system is thus consistent with Congressional objectives.

Plaintiff's proposed remedy—asking the Court to order the Service to issue findings for what are now 80 species within 12 months of a Court order—would undermine the goals and balance of the Service's Workplan. The carefully considered Workplan spreads out numerous deadlines until Fiscal Year ("FY") 2027. *Id.* ¶ 19. Twelve-month findings require expenditure of significant resources. If ordered to complete 12-month findings on all 80 species and publish those findings within one year of a Court order, as Plaintiff requests, the Service would have to immediately reprioritize its carefully planned workload. *Id.* ¶ 29.

This would be problematic for at least three reasons. First, the Service does not have the available funding or staff resources to add this immense workload in FY 2024 or 25. *Id*. Second, imposing dozens of new deadlines in FY 2024 or 25, without the additional resources needed to complete the supplemental work, threatens to undermine the comprehensive and balanced Workplan. Adding to this significant workload, without providing the Service adequate latitude to slot it into its existing Workplan, would be counterproductive and would require the Service to delay work on other higher-conservation-priority obligations in the Workplan to the detriment of

other species. *Id*. Third, Plaintiff's proposed remedy would lead to dozens of rushed decisions and would not allow time to gather and adequately analyze the science and data Congress required in the ESA.

###### C.   As articulated in *Train*, courts recognize that it may be infeasible for agencies to comply with statutory deadlines.

Plaintiff faults the Service for not applying a rote chronological approach in ordering its listing priorities and instead considering other factors, such as the agency's budgetary and staffing constraints, its existing court-ordered deadlines, and similar practical realities. But it is well established in this Circuit that budgetary constraints are, in fact, a circumstance in which it might be necessary to delay agency action. *See Train*, 510 F.2d at 712-13. Plaintiff's cramped reading of the ESA and the Service's listing priority guidelines not only ignores the Service's other listing obligations, but it would also strip the agency of any discretion in balancing its resources with the competing conservation needs of hundreds of species. Besides, it ignores Congress's direction to impose appropriations caps on the Service's ESA listing program.

Courts have recognized the Service's impossible task of balancing its immense responsibilities on a shoestring budget. *See supra* at 25-26; s*ee also Cal. Native Plant Soc'y v. Norton*, No. Civ. A. 03-1540 (JR), 2005 WL 768444, at *7 (D.C. Cir. Mar. 24, 2005) ("Stripped to their essence, FWS's basic explanations for why listing the Spineflower and other species was warranted but precluded were that FWS had statutorily mandated deadlines, court-ordered actions, higher priority listing activities, and a very limited budget. Despite protests from the plaintiffs, all of these explanations are legitimate."); *cf Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne*, 531 F.3d 792, 808 (9th Cir. 2008) (noting the Service "enjoys considerable scheduling discretion in the management of listing and research priorities"); *see also Friends of Wild Swan v. FWS*, 945 F. Supp. 1388, 1401 (D. Or. 1996) (recognizing that a "lack of funds, when Congress expressly prohibits expenditures for listing species, can excusably delay mandatory listing determinations") (citation omitted); *Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1252 (10th Cir. 1998) (finding that Secretary had adequately demonstrated impracticability of issuing 90-day preliminary

finding due to Congressional funding moratorium); *Env't Def. Ctr. v. Babbitt*, 73 F.3d 867, 872 (9th Cir. 1995) (finding that Secretary failed to comply with nondiscretionary duty to make 12–month finding, but excusing compliance until appropriated funds from Congress were available).

Rather than grappling with the holdings in these cases, Plaintiff instead points the Court to what the Service managed to do nearly 30 years ago—in the early 1990s—as evidence of what it believes is a reasonable benchmark for what the agency could be doing today. Not only is the comparison antiquated, but it fails to account for important changes in how the Service has approached its listing obligations in the decades since. For example, one of the reasons that the Service was able to list so many species in the 1990s is that those listings were rarely accompanied by designations of critical habitat. Indeed, between April 1996 and July 1999, the Service listed 256 species as threatened or endangered, but published critical habitat designations for only *two* of them. *See* Benjamin Jesup, *Endless War or End this War? The History of Deadline Litigation Under Section 4 of the Endangered Species Act and the Multi-District Litigation Settlements*, 14 Vt. J. Env't L. 327, 352 n.153 (2013). Section 4(a)(3) of the ESA requires the Service to designate critical habitat concurrent with listing "to the maximum extent prudent and determinable." 16 U.S.C. § 1533(a)(3)(A). During these years, the Service relied heavily on this language in declining to designate critical habitat for hundreds of species—thus allowing the Service's listing budget to stretch further. But as Jesup notes, in doing so, the Service "was creating a piper that would have to be paid," and ultimately led to a new wave of litigation requiring the Service to fold critical habitat designations into its workload. Over the next several years, environmental groups, including the Center for Biological Diversity, succeeded in securing so many court orders requiring the Service to issue final listing decisions and to designate critical habitat that in 2001, the Service reached a point where it would be forced to choose between violating the Anti-Deficiency Act[22] or finding itself in contempt of court for violating court orders. In the two decades

---

[22] The Anti-Deficiency Act makes it a crime for federal agencies to expend more than is appropriated by Congress, among other things. 31 U.S.C. § 1341(a)(1)(A).

since, plaintiffs have continued to weaponize the ESA through litigation in an effort to elevate their respective priorities.[23] But in a zero-sum context of limited resources, everything cannot be the highest priority.

**D.      The Court has discretion to set a feasible remedy that preserves the Workplan's schedule and its ordering of priorities.**

The Service is not arguing that the Court should refrain from ordering 12-month findings for the remaining 80 species by dates certain. The only question is on what schedule. Plaintiff has offered no reasoning why the 12-month finding for each of the species included in its complaint should necessarily be elevated above the numerous listing and critical habitat actions for more-imperiled species already addressed in the Service's Workplan. Indeed, as described above, as the Service's listing bandwidth has been consumed almost exclusively by court orders (and therefore by plaintiff groups), a species not lucky enough to have an advocate risks languishing at the back of the line despite its biological status being highly imperiled.

Statutory deadlines do not require a reviewing court to blindly advance whatever action happens to be the subject of a lawsuit without considering the broader context. In considering the remedy for a missed statutory deadline, "the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities." *In re Barr Labs.*, 930 F.2d at 74 (citing *In re Monroe Commc'ns*, 840 F.2d 942, 946 (D.C. Cir. 1988)). Courts determining whether to enforce a statutory deadline have therefore considered "the effect of expediting delayed action on agency activities of a higher or competing priority." *Telecomms. Research Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984). In setting compliance timeframes for an agency, courts should recognize when "it is possible that budgetary commitments and manpower demands required to [comply with a statutory deadline] are beyond the agency's capacity or would unduly jeopardize the implementation of other essential

---

[23] *See generally* Michael Doyle, Pamela King, *How the Courthouse Came to be a Major Habitat for the ESA*, E&E News: GREENWIRE (June 20, 2023, 1:21 PM), https://www.eenews.net/articles/how-the-courthouse-came-to-be-a-major-habitat-for-the-esa (last visited December 18, 2023).

programs." *Train*, 510 F.2d at 712.

Here, the Service's existing Workplan reflects careful consideration of its resources and capabilities and is also the product of years of internal deliberation and decisionmaking. Frazer Decl. ¶¶ 15-19. Reordering the Service's Workplan to accommodate the 80 species Plaintiff identifies would simply shuffle these particular 12-month findings ahead of numerous other species, some of which have been waiting longer for petition findings. *See id.* ¶ 29. Furthermore, the Service has commenced work on most, or all, of the actions on the Workplan. Dropping that work (if not court ordered) and then picking it back up in future years would result in stale information and greatly decrease efficiency. Requiring the Service to immediately complete work on these 80 species would divert work from candidate species that the Service has committed to addressing as part of a balanced approach to managing all aspects of its listing workload, from completing petition findings to resolving the listing status of candidates already found to warrant listing. *See generally id.* ¶¶ 28-32.

Plaintiff's attempt to push its priorities to the fore is much like the proposal rejected by the D.C. Circuit in *In re Barr Laboratories*. In that case, the Food and Drug Administration ("FDA") missed a statutory deadline to rule on generic drug applications, but the D.C. Circuit noted that the missed deadline must be considered in the context of broader resource constraints and competing priorities. The plaintiff, Barr Labs, had failed to show "that the FDA had singled it out for mistreatment." *In re Barr Labs.*, 930 F.2d at 75. Given the many competing demands for "equally worthy generic drug producers" and the FDA's limited resources, the existence of a deadline did not show that Congress intended "a super-priority for Barr, and it did not address the trade-off between strict compliance with the 180-day deadline and the FDA's disposition of its other projects." *Id.* at 76. Thus, "a judicial order putting Barr at the head of the queue simply moves all others back one space and produces no net gain." *Id.* at 75; *see also In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 553 (D.C. Cir. 1999) (cautioning against enforcing statutory deadlines in a manner that allows plaintiff "simply to force its matter to the front of the line" regardless of broader statutory goals).

Nor is this an instance in which an agency seeks to delay one kind of objective in order to focus its priorities on different sorts of objectives. The Service seeks to satisfy other priorities that are all, like the deadline sought by Plaintiffs, concerned with advancing qualified species toward receiving the substantive protections of the ESA.

## IV.    The Service cannot disregard Congressionally imposed appropriations caps.

Instead of advancing reasons why these particular species should be moved to the top of the Service's workload—ahead of work that the Service has determined, in its expertise, is more urgent—Plaintiff argues that the Service's backlog is self-inflicted as it pursues "administrative perfection."[24] These arguments are fundamentally flawed.

### A.    Congress places annual caps on the Service's ESA listing program.

First, Plaintiff fails to acknowledge that Congress has placed spending caps on the Service's ESA listing program. Congress—not the Service—has the power of the purse and is responsible for authorizing the expenditure of public monies. *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 58 (D.D.C. 2015). "Authorization and appropriation by Congress are nonnegotiable prerequisites to government spending." *Id.* (quoting U.S. Const. art. I, § 9, cl. 7). Appropriations legislation provides legal authority for federal agencies to incur obligations and to make payments out of the Treasury for specified purposes. *Id.* Appropriations legislation has "the limited and specific purpose of providing funds for authorized programs." *Andrus v. Sierra Club*, 442 U.S. 347, 361 (1979) (quoting *TVA*, 437 U.S. at 190). And while an agency may request funding through budget submissions to Congressional committees, it is Congress alone that determines the ultimate amount of appropriations. *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (noting the Appropriations Clause "means simply that no money can be paid out

---

[24] The irony is not lost on Defendants that Plaintiff complains of an agency "pursuing administrative perfection" and elevating the "best *possible* science" over the "best *available* science." By the Service's estimation, over the last decade, the Center for Biological Diversity alone has filed 127 lawsuits that included ESA Section 4 claims, more than 40 of which challenged the merits of ESA Section 4 determinations, arguing, among other things, that the Service's findings were either legally deficient, scientifically flawed, or both.

of the Treasury unless it has been appropriated by an act of Congress" (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

Second, Congress may, if it so chooses, place a cap in appropriations legislation limiting the amount of federal money that can be expended on a particular program or for a particular purpose, regardless of other statutory obligations. *See, e.g.*, *Adams v. United States*, 141 Fed. Cl. 428, 432-33 (2019) (describing annual appropriations caps on the amount of overtime pay that a customs employee could receive notwithstanding the requirements of the Fair Labor Standards Act). And Congress may even amend pre-existing statutory obligations through appropriations legislation if its intent to do so is clear. *United States v. Will*, 449 U.S. 200, 221-22 (1980) (quoting *United States v. Dickerson*, 310 U.S. 554, 555 (1940)). It is also well-established that the plain language of an appropriations action, coupled with the legislative history, is evidence of Congress's intent. *Will*, 449 U.S. at 221-22.

The text of the appropriations caps here demonstrates Congress's clear intent to limit the expenditure of funds for the Service's ESA listing program. Since at least 1997, Congress has included a rider in the appropriations for the Service's primary source of funding, the Resource Management account, that controls the funds available for use in the Service's listing program. *See* Exhibit C, Table of Excerpts from Appropriations Legislation for FY 2014 through FY 2020; *Omnibus Consolidated Appropriations*, Pub. L. No. 105-277, 112 Stat. 2681 (1998); *Dep't of the Interior and Related Agencies Appropriations Act, 1998*, Pub. L. No. 105-83, 11 Stat. 1543, 1547 (1997). Thus, while Congress provides a lump sum for the Service's operations, it restricts expenditures from that appropriation using a phrase that begins "*Provided*, That not to exceed . . . ." *See, e.g.*, Ex. C. The use of that phrase demonstrates Congress's clear intent to impose a cap on the total funds available for the listing program. *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 202-03 (2012) (Roberts, C.J., dissenting) (quoting 2 General Accounting Office, *Principles of Federal Appropriations Law*, 6-8 (2d ed. 1992) ("[T]he most effective way to establish a maximum . . . earmark is by the words 'not to exceed' or 'not more than'")).

Additionally, the committee reports for the 1998 and 1999 fiscal year budgets leave no

doubt that Congress intended to impose precise funding limits on the listing program by enacting spending caps. H.R. Rep. No. 105-337, at 56 (1997), *reprinted in* 1997 U.S.C.C.A.N. 2186, 2191 ("As requested by the Department of the Interior the managers reluctantly have agreed to limit statutorily the funds for the endangered species listing program.")[25]; H.R. Rep. No. 105-825, at 1187 (1998) ("The conference agreement includes bill language earmarking the Endangered Species Act listing program at $5,756,000 . . . ."). Thus, notwithstanding the Service's duty under Section 4 of the ESA to complete 12-month findings within a year of receipt of a petition that presents substantial scientific information indicating that listing may be warranted, Congress has clearly imposed annual limits on the funds available to implement the ESA listing program.

### B. The Service expends funds on the ESA listing program in accordance with Congress's direction.

Whatever disagreements Plaintiff may have with the way the Service employs its appropriated funds, the Service does so consistent with Congress's direction. In recent years, Congress chose to specifically carve-out certain elements of the ESA listing program from the appropriations cap imposed on the Service's listing program (*i.e.*, five-year reviews, as well as actions concerning de-listing and down-listing species under ESA Section 4(c)(2)). *See, e.g.*, *Further Consolidated Appropriations Act, 2020*, Pub. L. No. 116-94, 133 Stat. 2534, 2689 (2019) (specifically removing the "processing petitions, developing and issuing proposed and final regulations, and taking any other steps to implement actions described in subsection (c)(2)(A), (c)(2)(B)(i), or (c)(2)(B)(ii)" of Section 4 of the ESA from the cap). To the extent that Plaintiff

---

[25] As the volume of listing-deadline litigation increased, and available resources grew only slowly, the Department of the Interior and its appropriators in Congress realized that there was a distinct possibility that FWS would face a combination of court orders with which it would be impossible to comply without violating the budget allocations in the committee reports. If FWS was required to work on listing actions that would require, in aggregate, expenditures in excess of the listing budget, to avoid contempt of court, FWS might be forced to seek to have resources reallocated from other areas of its budget. This would dramatically reduce the certainty with which FWS could administer its other programs, with concomitant decreases in efficiency and effectiveness. As a result of these concerns, Congress converted the budget allocation for the listing program into a statutory mandate for FY 1998.

suggests the Service's funding of, and action on, de-listing and down-listing determinations reallocates funds that could otherwise be spent on the listing program, Plaintiff is wrong. The funding for these activities is separate.

Beyond that, the Service cannot simply allocate more funds to the listing program because an agency cannot use a more general appropriation to increase a specific appropriation. *See Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (applying the general-specific cannon to appropriations legislation). Consequently, the Service may not expend more on the listing program than the amount specified by Congress.

To the extent that Plaintiff disagrees with the Service's work outside of the listing program, those disagreements—without more—are of no significance here. So long as the agency complies with the constraints imposed by Congress—as the Service has done—it may exercise its discretion to fund programs as necessary "to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (citations omitted). The Court should therefore give no weight to Plaintiff's policy judgments regarding the various other programs funded from the Service's general appropriations.

### C.   Plaintiff's attempt to use this Court's equitable powers to circumvent the listing program's spending cap should be rejected.

Plaintiff's proposed remedy should also be rejected because court-imposed deadlines could eventually raise separation-of-powers concerns in the broader context in ESA Section 4 deadline litigation. There is a long history of litigants in ESA Section 4 deadline cases—including the Plaintiff in this case—filing large, multi-claim deadline lawsuits covering hundreds of species. *See* Jesup, *supra*, at 343, 370-77 (describing listing litigation in the 1990s and the MDL litigation). These litigation tactics not only disrupt the balance that the Service strives to implement for its listing program, but they also raise serious separation-of-powers concerns when considered for what they ultimately are: an end-run around Congressional spending limits.

Courts are reluctant to use equitable principles to require agencies to expend funds that Congress has not authorized. For example, in *Office of Personnel Management v. Richmond*, a

retired naval employee argued that the government should be equitably estopped from denying him disability benefits because of erroneous advice given to him by a government employee. 496 U.S. at 418. The Court rejected this argument, concluding that the equitable doctrine of estoppel could not override the clear command of the Appropriations Clause. *See id.* at 426 (quoting *INS v. Pangilinan*, 486 U.S. 875, 883 (1988)). In reaching this conclusion, the Court reasoned, in part, that the use of equity to expend unauthorized funds undermined the fundamental and comprehensive purpose of the Appropriations Clause: "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Id.* at 428.

So too here. Like the estoppel claim in *Richmond*, Plaintiff's request for the Court to compel the Service in equity to expend additional funds on the listing program is one step down the path toward "render[ing] the Appropriations Clause a nullity." *Id.* Litigants like Plaintiff, who are plainly "displeased with a [] restriction . . . imposed by Congress to ease burdens on the fisc," could simply seek to evade such restrictions by resorting to the equitable powers of the Court in one case after another. *See id.* Through the sheer volume of litigation (which, of course, is a tactic that has been used by Plaintiff in ESA Section 4 deadline cases in the past), plaintiffs could effectively "nullify a congressional decision" to cap funding for the ESA listing program. *See id.* at 429-30. Put simply, when viewed in the broader context of this case and its progeny of listing deadline lawsuits, Plaintiff's request for this Court to use its equitable powers to direct a remedy raises the possibility of significant separation-of-powers concerns.

## V.   The Court should defer to the Service's proposed compliance timeline, as outlined in the National Listing Workplan.

Courts have consistently noted that "'[f]lexibility rather than rigidity has distinguished' equity jurisprudence," and that a "court may forebear the issuance of an order in those cases where it is convinced by the official involved that he has in good faith employed the utmost diligence in discharging his statutory responsibilities." *See Train*, 510 F.2d at 713 (citing *Hecht Co.*, 321 U.S.

at 329). The Court is "in essence, [] called on to separate justifications grounded in the purposes of the Act from the foot-dragging efforts of a delinquent agency." *Id.* at 713; *see also* H.R. Rep. No. 97-835, at 23 (1982), *reprinted in* 1982 U.S.C.C.A.N. at 2863.

The Service has been exerting the utmost diligence in carrying out its statutory responsibilities. For example, since FY 2017, the Service has completed 90-day findings for 69 species, 12-month findings for 232 species, proposed listing rules for 104 species, proposed critical habitat rules for 115 species, final listing rules for 71 species, and final critical habitat rules for 55 species. In the last three fiscal years alone, the Service has completed 93 proposed listing or uplisting rules, 55 final listing or uplisting rules, 54 proposed 4(d) rules, 35 final 4(d) rules, 96 proposed critical habitat rules, 47 final critical habitat rules, 3 new warranted-but-precluded 12-month listing petition findings, and 95 not-warranted 12-month listing petition findings. Frazer Decl. ¶ 22.

Over the next five years, the Service has scheduled 235 12-month findings[26] (along with concurrent proposed listing if warranted, and proposed critical habitat designations, if prudent and determinable); three final listing rules, 48 standalone proposed critical habitat designations (for species that have already received positive 12-month findings). *See* Ex. A—National Listing Workplan. This work spans all eight of the Service's Regional Offices.

Importantly, the Service's commitments in its Workplan will require substantially all of the resources in the listing budget. Frazer Decl. ¶ 28. The Service intends to exert the utmost diligence in addressing the 12-month findings for the 80 species here. But it needs to be afforded sufficient time in which to slot these obligations in with its numerous other statutory and court-ordered obligations. The Service's request that it be allowed until the end of FY 2027 to finalize 12-month findings for 80 species that remain at issue here, in addition to 155 other actions unrelated to this litigation that are also on the Workplan, does not reflect "the foot-dragging efforts

---

[26] This figure includes the 80 species that remain at issue here. Each 12-month finding must either be a finding that the petitioned action is warranted, along with a proposed action to list, reclassify, or delist a species; a finding that the petitioned action is not warranted; or a finding that the petitioned action is warranted but precluded by higher priority actions.

of a delinquent agency," but rather a careful, realistic assessment of capabilities and priorities that is fully "grounded in the purposes of the [ESA]." *See Train*, 510 F.2d at 713; *see also* H.R. Rep. No. 97-835, at 23 (1982), *reprinted at* 1982 U.S.C.C.A.N. at 2863. The Service should be accorded latitude to integrate additional workload, rather than compressing these numerous findings into Plaintiff's proposed timeline. Otherwise, the Service will be forced to shift its well-reasoned priorities and destroy its goal of providing the public with transparency and predictability, leading to a higher likelihood of findings that are legally deficient, scientifically wanting, or both.

## VI.     Plaintiff's additional request for declaratory relief is inappropriate and should be denied.

Declaratory relief is not available to litigants as of right. *Pub. Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 241 (1952) (holding that the declaratory judgment statute "is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant."). Although determining whether declaratory relief is suitable falls to the Court's discretion, it is plainly inappropriate when it fails to serve a useful purpose, acts as an anticipatory defense, or when there are other remedies available. *See Steffel v. Thompson*, 415 U.S. 452, 466 (1974) ("Congress plainly intended declaratory relief to act as an alternative to the strong medicine of the injunction")); *see also Hanes Corp. v. Millard*, 531 F.2d 585, 592 (D.C. Cir. 1976) (quoting Professor Borchard's "general rule that the declaration is an instrument of practical relief and will not be issued where it does not serve a useful purpose").

Here, Plaintiff asks the Court for both injunctive relief and an extraordinary declaratory relief order. As discussed at length, Defendants do not object to the former in principle—only to Plaintiff's proposed schedule. Indeed, injunctive relief in the form of an order setting dates certain by which the Service must issue the remaining 12-month findings would remedy Plaintiff's alleged injury in full. But Plaintiff goes one step further to request that the Court declare "that the Service has systemically failed to respond to [Plaintiff's] petitions to list species as endangered or threatened within the ESA's explicit deadlines, including those at issue in this suit, and that the Service has adopted a process that effectively precludes it from responding to petitions within

statutory timelines." Pl.'s Mem. at 51. Plaintiff's request is inappropriate, and the Court should decline to grant such extraordinary relief for at least three reasons. First, it runs counter to the notion that courts may order *when* an agency must comply with its nondiscretionary duties, but not *how* the agency must comply with those duties. It is a bedrock principle of administrative law that litigants may not seek wholesale improvement of agency programs by court decree. Second, Plaintiff's anticipation that such relief "*may* have the salutary effect of spurring the agency to take action," *id.* (emphasis added), falls short of being "substantially likely to redress the alleged injury" as required by Article III. Finally, it exceeds the scope of relief outlined in Plaintiff's complaint.

*First*, the Supreme Court has roundly rejected litigants' attempts to effect sweeping change of agency programs by court decree. For instance, in *Lujan v. National Wildlife Federation*, the plaintiffs wanted to set aside the Bureau of Land Management's ("BLM") land withdrawal review program based on generalized allegations of harm and violations of the Federal Land Policy and Management Act, the National Environmental Policy Act, and the APA. Plaintiffs alleged that BLM's violations of the law were rampant within this particular program. The Supreme Court ruled that, even if these allegations were true, litigants "cannot seek *wholesale* improvement of [agency programs] by court decree, rather than in the offices of the Department of the halls of Congress, where programmatic improvements are normally made." *Lujan*, 497 U.S. 871, 891 (1990). "Except where Congress explicitly provides for our correction of the administrative process at a higher level of generality, we intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect." *Id.* at 894 (quoting *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164-66 (1967)).

Applied here, courts may not issue declaratory relief when it would affirm *how* an agency should comply with its nondiscretionary duties, rather than *when* it needs to comply with those duties. Defendants do not contest that the Court has jurisdiction to enforce the Service's nondiscretionary duty to issue 12-month findings, as the ESA requires. But *how* the Service organizes its listing program and issues specific determinations is left solely to the Service in its discretion. *See SUWA*, 542 U.S. at 65 ("Thus, when an agency is compelled by law to act within a

certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be."). Plaintiff seeks an end-run around this well-settled principle of administrative law by asking the Court to issue the extraordinary relief of an order castigating the Service to undertake a systematic overhaul of its listing program.

*Second*, Article III standing requires that a plaintiff establish three elements to proceed with its "case" or "controversy": injury-in-fact; causation; and redressability. Redressability requires a showing that it is "'likely,' as opposed to merely 'speculative,'" that a favorable judicial action will redress any harm plaintiff has suffered. *Lujan*, 504 U.S. at 561; *see also Wilderness Soc'y v. Norton*, 434 F.3d 584, 590 (D.C. Cir. 2006). Plaintiff cannot make this showing in its request for declaratory relief, and Plaintiff's own language conveys as much. Not only does Plaintiff's request for injunctive relief remedy its alleged harm in full, but it acknowledges that, at best, any declaratory relief "*may* have the salutary effect of spurring the agency to take action to streamline its listing process so that it will meet the Act's deadlines in practice rather than serially violate them." Pl.'s Mem. at 51 (emphasis added). As discussed above, neither Plaintiff, nor the Court, may interfere with the day-to-day operations of the Service's listing program. Plaintiff's hope that such an order from this Court will incentivize sweeping change at the Department level is precisely the kind of speculation that the Supreme Court rejected in *Lujan*. Furthermore, even if the Service were inclined to consider such sweeping change, that would not remedy Plaintiff's *present* injuries. Necessarily, any changes would be prospective, affecting the Service's future obligations. And Plaintiff cannot argue that it has standing to request relief for a potential future controversy.

*Finally*, in its complaint, Plaintiff requests relief for three categories of findings under ESA Section 4: 12-month findings, final listing determinations, and final critical habitat determinations. ECF No. 1 at 60-61. For each category, Plaintiff asks that the Court (i) declare that Defendants are in violation of the ESA and/or APA; and (ii) provide injunctive relief compelling Defendants to issue the overdue findings by dates certain. *Id.* Nowhere in the complaint does Plaintiff ask the Court for such sweeping relief as a declaration from the Court endorsing a blanket overhaul of the

ESA listing program. Federal Rule of Civil Procedure 8 requires that Plaintiff's complaint outline the demand for the relief it seeks and expressly allows for relief in the alternative, or different types of relief. Plaintiff should not be allowed to expand its requested relief on summary judgment nearly three years after the filing of its complaint, especially when its request for injunctive relief is capable of remedying its alleged harm in full. *See Dist. of Columbia v. Barrie*, 741 F. Supp. 2d 250, 263 (D.D.C. 2010) ("It is well established that a party may not amend its complaint or broaden its claims through summary judgment briefing." (citation omitted)).

## <u>CONCLUSION</u>

The Service takes seriously its charge of administering the ESA—one of the most expansive statutes for conservation enacted anywhere in the world. Agency officials and its wildlife biologists pride themselves on the important work they perform on a daily basis to protect imperiled plant and animal species both abroad and here at home. The backlog of species awaiting protection is not the result of a delinquent agency or of institutionalized foot-dragging but the consequence of several factors—not least of all, the practical realities and limitations of an agency with immense responsibilities and finite resources grappling with an ever-increasing workload of statutorily required actions. In its concerted effort to strike a reasonable balance between the competing needs of numerous species and its limited funding and staffing resources, the Service has come up with a measured solution in the form of its National Listing Workplan. This Workplan represents the culmination of years of input from agency experts, state and federal partners, and other stakeholders in an attempt to provide order and transparency into the ESA listing program.

For the reasons explained above, Plaintiff's requested remedy is neither workable nor responsible. Requiring the Service to issue the requested 12-month findings in twelve months would result in delay for other critically imperiled species; undermine the broader conservation purposes that ESA listing deadlines are meant to promote; and result in 12-month findings that would have a higher likelihood of being legally deficient, scientifically wanting, or both. Accordingly, the Court should deny Plaintiff's proposed remedy, and order that the 12-month

findings for the species for which the Court finds Plaintiff has standing be issued in line with the

schedule set forth in the Service's 2023 National Listing Workplan.

Dated: December 18, 2023                    Respectfully submitted,

                                            TODD KIM, Assistant Attorney General
                                            S. JAY GOVINDAN, Section Chief
                                            MEREDITH L. FLAX, Deputy Section Chief

                                            */s/ Davis A. Backer*
                                            DAVIS A. BACKER (CO Bar No. 53502),
                                            Trial Attorney
                                            LESLEY LAWRENCE-HAMMER,
                                            Senior Trial Attorney
                                            United States Department of Justice
                                            Environment & Natural Resources Division
                                            Wildlife & Marine Resources Section
                                            999 18th Street, South Terrace, Suite 370
                                            Denver, Colorado 80202
                                            Tel: (303) 844-1898 (Backer)
                                            Tel: (303) 844-1368 (Lawrence-Hammer)
                                            Fax: (303) 844-1350
                                            Email: davis.backer@usdoj.gov
                                            Email: lesley.lawrence-hammer@usdoj.gov

                                            *Attorneys for Defendants*